[Crim. No. 421.  In Bank.—February 27, 1899.]

THE PEOPLE, Respondent, v. RICHARD PHELAN, Ap-
pellant.

CRIMINAL LAW—HOMICIDE—SELF-DEFENSE—BURDEN OF PROOF—APPEAL—
CONFLICTING EVIDENCE.—Upon the trial of a defendant accused of
murder, if the voluntary killing of the deceased by the defend-
ant is established and admitted, a *prima facie* case is made to
sustain a verdict of guilty of murder in the second degree, and
it devolved upon the defendant to justify or excuse the killing;
and although the claim of self-defense may find much support in
the evidence, if there are circumstances in evidence conflicting
therewith, which may have led the jury to discredit the evi-
dence for the defendant, the verdict cannot be disturbed upon
appeal for insufficiency of the evidence.

ID.—THEORY OF AMBUSCADE—PRESUMPTION—ARGUMENT UPON APPEAL—
REFLECTION UPON TRIAL COURT.—Where the record upon appeal
showed that the prosecution prepared the case for trial in
reliance upon the theory that the defendant was lying in am-
buscade, behind a hollow stump, to await the approach of the
deceased to the junction of the trail where the homicide oc-
curred, and that evidence upon such theory was introduced
by the prosecution before the trial court referred thereto, it is
to be presumed that the theory was developed in the opening
statement of the district attorney; and it is improper and with-
out foundation for defendant's counsel, in their argument upon

appeal, to reflect upon the trial court as having first suggested
and announced that theory.

ID.—EVIDENCE—MAPS AND PHOTOGRAPHS—SCENE OF HOMICIDE—QUES-
TION FOR JURY.—Maps and photographs of the scene of the homi-
cide, and evidence as to the position of the hollow stump,
and the relative elevation of the stump and the junction of the
trail where the homicide was committed, and as to the view of
the trail from the stump, are admissible to show the facts sur-
rounding the homicide, and in support of the theory of the
prosecution, it being for the jury to determine whether that
theory had or had not sufficient support in the evidence.

ID.—RULINGS UPON EVIDENCE—REMARKS OF COURT.—It was not error
for the court in ruling upon the admissibility of such evidence,
to state that it was admitted as tending to sustain the theory
of lying in wait, advanced by the prosecution; and that it was
for the jury to determine whether that fact was proven.

ID.—CREATING . APPEARANCES TO JUSTIFY COUNTER-ASSAULT—INSTRUC-
TION—EFFECT OF VERDICT.—If there is any evidence to sustain the
court in submitting the question to the jury, it is proper to in-
struct them that if the defendant created appearances to justify
the deceased in making a deadly counter-assault in self-defense,
and the defendant slew him while making such counter-assault,
and did not, or from the suddenness of the counter-assault could
not, notify him that he had abandoned the contest, the killing
was unjustifiable. Any part of such instruction based upon the
hypothesis of a deliberate purpose to create such appearances,
is rendered immaterial by a verdict acquitting the defendant
of murder in the first degree; and the instruction will be con-
sidered as if based upon the hypothesis of their creation without
preconceived design.

ID.—EVIDENCE—OPINION OF PHYSICIANS—DIRECTION OF BULLET.—A prac-
ticing physician and surgeon who conducted the autopsy of the
deceased, and who, though having small previous experience
in gunshot wounds, had specially studied the subject, and was
qualified to answer a hypothetical question, and able to state
the grounds of his opinion, is qualified to testify to his opinion
as to the exit and entrance of the bullet with which the de-
ceased was killed. The value of the testimony is a question for
the jury.

ID.—THREATS OF DECEASED—ADMISSIBILITY OF CONVERSATION—ERROR
WITHOUT PREJUDICE.—A witness testifying to threats made by the
deceased in a conversation should be permitted to testify to so
much of the conversation between them as may show the true
meaning and significance of what the deceased actually said.
Technical error in limiting the evidence to the threats made by
the deceased, is without prejudice, where the whole conversa-
tion was subsequently stated by the witness, and the parts
originally excluded were not essential to an understanding of all
that the deceased said.

ID.—CHALLENGE TO GRAND JURORS—MOTION TO SET ASIDE INDICTMENT—
CASE AFFIRMED.—A defendant who though not held to answer at
the time of the formation of the grand jury, was at that time
in actual custody, charged with murder, and was brought into
court before the grand jurors were sworn, and offered the priv-
ilege of challenging, which he declined to exercise, cannot there-
after move to set aside the indictment upon statutory grounds
of challenge to the panel of grand jurors, or to any individual
grand juror, or avail himself of such grounds of challenge.
*People v. Geiger*, 49 Cal. 650, affirmed on this point.

ID.—MISCONDUCT OF JURORS—INCOMPLETE AFFIDAVITS—MOTION TO SUB-
POENA JURORS—DISCRETION.—Upon the filing of affidavits on motion
of the defendant for a new trial, alleging that one of the jurors
was seen during the trial in earnest conversation with a brother
of the deceased, but not showing that the conversation related
to the case on trial, and alleging upon information that another
juror had publicly stated during the trial that the defendant
ought to be hanged, without naming any person who heard the
statement, a motion of the defendant to postpone the hearing
of the motion, and for a subpoena to the jurors that they may
be examined as to their alleged misconduct, is addressed to the
discretion of the court; and though it would be a wise exercise
of discretion to investigate fully the alleged charges, the denial
of the motion is not an abuse of discretion.

ID.—NEWLY DISCOVERED EVIDENCE—FAILURE OF CROSS-EXAMINATION.—
Newly discovered evidence from a witness for the prosecution,
which was so closely related to evidence given by him at the
trial that it might have been called out upon cross-examina-
tion at that time, is not ground for a new trial.

ID.—EVIDENCE—EXPERIMENTS FOR PROSECUTION—REBUTTAL.—Experi-
ments for the prosecution made for the purpose of contradict-
ing defendants' witnesses as to the hearing of certain sounds
in the night time in the vicinity of defendant's cabin, are ad-
missible, though made in the day time, if the principal condi-
tions were the same. The jury can weigh the evidence, and
make allowances for any difference in atmospheric conditions
between the day-time and the night-time.

ID.—MISCONDUCT OF DISTRICT ATTORNEY.—There is no misconduct of the
district attorney, requiring a reversal of a judgment of convic-
tion, in a line of cross-examination to discredit witnesses for
the defendant, a failure in which could only prejudice his own
case, or in charging acts and motives against the defendant
which were a part of the theory of the prosecution, or in im-
properly reading a telegram to the jury, to which the defendant
failed to object, having the opportunity to do so, or in asking
improper questions which were disallowed by the court, where
the impropriety, though obvious, was not of a flagrant char-
acter.

APPEAL from a judgment of the Superior Court of Sierra County and from an order denying a new trial. Stanley A. Smith, Judge.

The facts are stated in the opinion of the court.

Barclay Henley, F. D. Soward, and Edward J. Banning, for Appellant.

W. F. Fitzgerald, Attorney General, and Charles H. Jackson, Deputy Attorney General, and F. H. Wehe, District Attorney of Sierra County, for Respondent.

BEATTY, C. J.—The defendant was convicted of murder in the second degree, but recommended by the jury to the mercy of the court. He was sentenced to be imprisoned for twenty-five years, and appeals from the judgment and from an order denying him a new trial.

Various errors are assigned upon the rulings of the superior court, misconduct of the district attorney is charged, and it is also contended that the evidence adduced at the trial was entirely insufficient to warrant or sustain the verdict.

The voluntary killing was admitted by the defendant, but the claim was made that it was done in necessary self-defense. This plea rests mainly upon the testimony of the defendant himself, for there was no eye-witness to the encounter, in which the deceased was instantly killed, save the parties; and the defendant's account of what then took place is corroborated by the direct evidence of only one witness who heard the shooting, and testifies to the number of shots fired and the order in which the lighter and heavier reports occurred. Aside from this the case for the defendant consisted in the proof of numerous and recent threats by the deceased against his life. Upon this point it is conceded by counsel for the people that the threats were clearly proven, and this concession goes none too far in view of the evidence contained in the record. It seems that the defendant had formerly been superintendent for a mining company which had failed, leaving some wages due to the deceased. In an attempt to recover these wages by suit the deceased complained that defendant had not properly seconded his efforts. The defendant would not attend as a witness at the trial unless

subpoenaed, and he appears to have found fault with the plan of operations adopted by deceased, all of which seems to have produced more or less ill-feeling on the part of the latter. Another grievance was the discharge of the deceased from the employ of another mining company of which defendant continued to be superintendent. In this way the deceased had been aroused to a state of violent hostility toward the defendant, and during the three or four months prior to his death had frequently threatened his life. Some of these threats had been communicated to the defendant, and he knew that deceased habitually went armed with a pistol, in the use of which he was supposed to be expert. The defendant was superintendent of the Hilda mine, situated five or six miles above Sierra City, and occupied a cabin there in company with two miners and a cook. The route from the mine to Sierra City was down a trail to the Leary wagon road and along this and the Sierra Valley road to town. The deceased lived in a cabin at a place called Milton, beyond the Hilda mine, and in going from Sierra City to his home usually passed over the route to the mine as far as a point beyond the junction of the Hilda trail with the Leary wagon road. This being the general situation of affairs, the parties met early on the morning of the nineteenth day of October, 1897, in front of Thomas Devine's place, about a half mile above Sierra City. The defendant had been to town with a couple of pack mules for the purpose of transporting to the mine some iron water pipe which he had previously ordered cut into convenient lengths for packing. The pipe not being ready, he was returning to the mine without it. The deceased was on his way to town, and was engaged in conversation with Devine when defendant came up. According to the testimony of defendant, in which he is corroborated by Devine, the deceased commenced upon the sore subject of the suit for wages, with the result of the usual disagreement, but the defendant in other ways made several friendly and conciliatory overtures which were angrily rejected by deceased. Devine also made an effort to bring about a reconciliation, but deceased refused to shake hands. Defendant then left, and in leaving stated in the hearing of deceased that he was coming back in the evening to get the water pipe which he had failed to get that morning. The deceased was thus

advised that on his road home in the afternoon he might meet the defendant coming to town.

According to the testimony of the defendant and four other persons who were there on that day, he returned to the mine about 10 o'clock A. M., and remained until after dinner, about 1 P. M. During that time he announced his intention of going back to town for the purpose of having Dan O'Connor (the deceased) put under bonds to keep the peace.

While waiting for dinner defendant learned that one of his miners (White) had quit work. This led to some warm words between them, after which White started to town. Defendant says that being apprehensive that White would get to drinking and return in an ugly mood, he directed all the firearms about the mine to be secreted or put out of the way to prevent mischief. There were at the mine a Winchester repeating rifle, forty-four calibre, a muzzle-loading shotgun, a breech-loading shotgun, a large pistol, forty-four calibre, and a Smith & Wesson revolver, thirty-eight calibre, the last being a pistol habitually carried by defendant in his pocket. The muzzle-loading shotgun and large pistol were hidden away. The breech-loading shotgun was put in charge of the remaining miner (O'Conna), who was directed by defendant to take it with him down the trail where he was set to work mending the road. The defendant took the small pistol and the Winchester rifle and followed O'Conna down the trail. He says that his purpose in taking the rifle as well as the pistol, which he usually carried, was partly to keep the rifle out of the way of White, and partly to defend himself in case he should meet Dan O'Connor on his way to town, and he should attempt to carry out his threats.

In the mean time, deceased had proceeded to town, made some small purchases, and started home on foot. He took dinner with the Sharkeys, two of whom testify that they saw him exhibit a loaded pistol (imitation Smith & Wesson, thirty-eight calibre), and heard him boast of his skill in using it. One of them says that deceased declared to him that he expected he might meet defendant on the road, and if he did he would bring him down. From Sharkey's he proceeded to Devine's, where he had met defendant in the morning, and Devine testifies to seeing his pistol and hearing similar threats against the life of defendant. He

left Devine's about 2 o'clock, going in the direction of the junction of the Hilda trail with the Leary road. This point being only three and a half miles from Devine's, he should have arrived there as early as 3 o'clock P. M.

Returning to the defendant, he says that he passed on down the trail beyond the point where O'Conna was at work, took note of the places on the trail requiring repairs, did some work himself until about a quarter to four, and then started to town. Arriving at the junction of the trail with the road, he stopped to make an estimate of the amount of grading required in order to construct a "turnout" for wagons hauling supplies for the mine to the foot of the trail. While so engaged, he happened to look up and discovered Dan O'Connor standing about thirty feet distant on the road. At the moment he was carrying his rifle across his shoulder with the muzzle in front and was grasping it by the barrel. He says they eyed each other for an instant and he was hesitating whether or not to speak to the deceased, when he saw him make a motion with his hand toward his pistol pocket, and fearing for his life he proceeded as quickly as possible to get his rifle into a position for use. Before he could do so deceased had drawn his pistol and fired twice, during which time he, defendant, was dodging and ducking across the road to a position on the other side. The deceased was prevented from firing a third shot before defendant could use his rifle by some difficulty in revolving the cylinder of his pistol, and while he was endeavoring to cock it defendant dropped on his knee and fired, his bullet passing through the neck of the deceased from side to side, severing the spinal cord and killing him instantly. This is substantially the account of the killing given by the defendant in his testimony at the trial, and he is directly corroborated by O'Conna in one particular: O'Conna testifies that he heard the shots at the point where he was at work on the trail, and that they came in this order: two light reports followed by one louder and heavier. If this account is true, the defendant was of course innocent of any crime. He shot only to defend his life against a felonious assault, and under circumstances that would have induced any reasonable man to believe his life to be in danger.

But were the jury bound to accept the statement of defendant as the truth? It is contended on the part of the people that not

only were the jury free to reject the testimony of the defendant in his own favor, but they were abundantly justified in so doing by numerous and serious discrepancies between the different accounts of the transaction given by the defendant at different times, by the discrepancies in the testimony of his witnesses, and by various circumstances inconsistent with the facts as testified to.

Most of these discrepancies appear to be trivial and unimportant, and fairly referable to the incapacity of the most honest and well-meaning of witnesses to carefully observe and accurately recount the details of any transaction. But some of them are more serious and deserve consideration.

The theory of the prosecution is, that defendant, on account of the threats of the deceased, deliberately resolved to kill him, and in order to give the killing the appearance of an act of self-defense arranged and contrived the circumstances upon which he now relies to give an air of plausibility to his account of the fatal meeting. They contend that the secretion and removal of the arms at the mine for the alleged purpose of keeping them out of the reach of White was a mere pretense to screen the real motive of the defendant in taking the rifle down the trail where he expected to meet the deceased; that no work was needed on the trail nor any turnout at the foot of it; that the supplies for the mine were all in for the winter and the season during which the trail could be used at an end; that while work on the trail was entirely needless at that time, work in the mine was an urgent necessity to prevent caving. They seem to claim that O'Conna was armed with the breech-loading shotgun and stationed in convenient proximity to the spot where the defendant lay in wait for his victim, in order to have his assistance in some form. They ask why the defendant should have abandoned his purpose of returning to Sierra City with his mules for the load of water pipe, and why he should have made up his mind on that day, of all days, to put O'Connor under bonds to keep the peace. They say that O'Connor must have reached the junction of the trail and must have been killed about an hour before the time when defendant says they met, and, consequently, that it is not true that defendant spent the afternoon directing and assisting in the repair of the trail. Having, as they claim, demonstrated

the falsity of his showing in this particular, they argue that, in order to make sure of his victim, he went directly from the mine to the foot of the trail, concealed himself behind a hollow stump near the junction, waited the arrival of O'Connor, and as he turned from the road to ascend the trail shot him in the side of the neck, rather from the rear than from the front.   Then, they say, he remained near the spot for an hour or two arranging appearances to support his plea of self-defense.   It was shown that the pistol of deceased was handed by defendant to the magistrate into whose custody he surrendered himself after the killing; that defendant requested those present to examine it, and it was found to contain two whole cartridges and three exploded shells, upon one of which the hammer rested.   These cartridges and shells, though of the right calibre for the pistol, viz., thirty-eight, were what is known as long cartridges, or Winchester rifle cartridges, which when placed in a Smith & Wesson pistol are too long to admit the rotation of the cylinder unless the ends are first trimmed off, as these had been.   The prosecution claims to have proved that deceased had no such cartridges, while defendant did have a supply of them, from which his own pistol was loaded, and it is a part of their theory of the case that after killing O'Connor defendant filled his pistol with cartridges taken from his own, and then discharged three of them to make it appear that deceased had fired that often at him.   Some of the witnesses testified that at the time he gave himself into custody defendant stated that deceased had fired three times.   Afterward he testified that he had heard but two shots before he returned the fire, and could only account for the three empty shells by supposing that the deceased succeeded in cocking his pistol and fired the third shot simultaneously with the discharge of his rifle, or that deceased had shot away one of his five cartridges previous to their meeting.   In stating to the magistrate that deceased had fired three times he was only stating his conclusion drawn from the three empty shells, and based upon his theory that the third shot being discharged simultaneously with his own was indistinguishable.   The prosecution rejects this explanation, and  contends  that  the defendant only  changed his statement as to the number of shots fired by deceased after Jesse O'Conna had testified to two light reports followed by a louder one in order to make their stories agree.

This is by no means an exhaustive review of the various contentions of counsel as to the effect of the evidence, but it presents the salient points of the controversy between them, and it will be seen that it involves questions of fact rather than of law—questions, in other words, to which the jurisdiction of this court does not extend. We have, nevertheless, carefully examined the evidence in the case, and, while we cannot help regarding several of the theories of the prosecution in respect to the motives and acts of the defendant as fanciful and unfounded, we are at the same time convinced that it cannot be held as a proposition of law that there is no evidence to support the verdict. ·

The theory of the prosecution that the defendant went directly from the Hilda mine to the junction of the trail and there lay in wait behind a hollow stump for an hour or two finds no support in the evidence, and seems to be utterly opposed to the testimony of some of the most intelligent and trusted witnesses for the people to the effect that a careful examination of the ground on the day following the killing disclosed no track or other disturbance of the soil behind or about the stump. Considering the nature of the soil in our mountain forests, it seems incredible that a man could crouch for an hour or more in one spot and leave no trace of his presence on the ground.

The theory of the prosecution as to the hour of the shooting is equally unsupported by direct evidence. The claim is that the deceased must have arrived at the junction of the Hilda trail about 3 o'clock P. M., and that he was shot from ambush as he turned into the trail. This claim is rested mainly upon an elaborate calculation as to the time that must necessarily have elapsed between the discovery of the dead body by Sam Devine and his return to the spot from Sierra City at 6 o'clock P. M. In this calculation it is assumed that Devine did not discover the body until some time after the shooting; that it took him more than an hour to reach Sierra City, at least half an hour to get a team and look up the magistrate and two others who accompanied him on his return, and nearly an hour to drive three miles and a half. These are all assumptions without any positive evidence to support them. For aught that appears, Devine may have arrived at the scene of the shooting within ten minutes after it occurred, and as to the time it took him to get to Sierra City,

his evidence is, that at the request of the district attorney he went over the same route again at about the same speed that he traveled on the day of the homicide, and it took him "about an hour." Considering that it was a prime factor in the theory of the prosecution that it must have taken him considerably more than an hour, the fact that the district attorney contented himself with this vague and indefinite answer from a witness who had made the experiment at his request justifies the inference that the time actually consumed was less rather than more than an hour, and this conclusion is corroborated by the admitted fact that on the day of the homicide Devine was excited and scared, and may have traveled faster than he was aware of. The other circumstances relied on to prove a greater lapse of time between the killing and the hour of 6 o'clock than would consist with defendant's story may possess a significance that is not apparent from any evidence in the case, for there is nothing to show that the blood would not have flowed as far as it did flow, or that the body would not have become as cold as it was within the two hours between 4 and 6 o'clock.

The theory that defendant loaded the pistol of deceased with cartridges taken from his own pistol in order that he might fire them off and thus make it appear that deceased had participated in the shooting, assumes, in the first place, against the positive evidence of several unimpeached witnesses and against all antecedent probability that deceased was traveling with an unloaded pistol along a road where he had every reason to expect an encounter with an armed man whom he had constantly been threatening to kill, and this, too, when it clearly appeared that the deceased habitually went armed, and that he had a short time before borrowed cartridges to load his pistol. But the prosecution proved that there remained in the pistol of deceased, when surrendered by the defendant, one or two thirty-eight calibre Winchester rifle cartridges, with the ends trimmed off to make them short enough for the cylinder, and two empty shells of the same class of cartridges. It was also proved that a week after the homicide part of a box of such cartridges was found in the cabin of the defendant at the Hilda mine, and Davis, the roommate of the deceased, testified that they had no cartridges that would fit the pistol of deceased at their cabin aside from those

with which it was loaded. As against this evidence the defendant points to the fact that there was no gun or pistol at his mine that a thirty-eight calibre Winchester cartridge would fit, and claims that the box found in his cabin a week after his incarceration was put there to be found. And Davis, in support of the motion for a new trial, made an affidavit that there was at the cabin occupied by him and deceased a box of thirty-eight calibre Winchester cartridges—a statement not inconsistent with his testimony that they had no cartridges that "would fit" the pistol of deceased, since they required to be reduced in length in order to make them fit. But the strongest circumstance against the theory of the prosecution is the failure to produce any evidence as to the condition of defendant's pistol at the time he surrendered himself into custody. Was it loaded or unloaded, or partly loaded? If loaded, what was the kind of cartridges? There is no answer to any of these questions, although the pistol was in the hands of the state's officers and the evidence necessarily within their power. The defendant's claim is, that his pistol was loaded at the time of the homicide with cartridges expressly adapted to it, viz., thirty-eight calibre pistol cartridges, and if so it must have been in that condition when handed to the sheriff. If it was not in that condition, the fact could easily have been shown, and the theory of the prosecution established, or at least corroborated, by evidence to a contrary effect. It was of the greatest importance to the theory of the prosecution to prove that defendant's pistol when surrendered to the sheriff was unloaded or loaded with Winchester cartridges that had been reduced in length, or partly so loaded. In the absence of such proof, the theory of the prosecution seems wholly untenable.

Other theories—such, for instance, as that respecting the supposed attempt of the defendant to mutilate the dead body by running a loaded wagon over it for the purpose of obliterating the wound and thus making it impossible to determine the points of entrance and exit of the fatal bullet—depend upon evidence and inferences equally inconclusive. The most that can be said of them is that they may be true—just as it may be true as argued that the deceased had no intention of carrying out his threats against the life of the defendant, and that the absence of any threats by defendant against the deceased and his efforts at recon-

ciliation are only evidence of a deeply meditated scheme of murder with a defense prepared in advance. We think it evident that the theories and arguments above outlined have but little, if any, positive force or value as tending to establish the guilt of the defendant, but some of them may have a negative value as offering a possible explanation of some circumstances, and much positive testimony which, viewed in another light, would tend to establish his innocence.

The case, then, so far as the sufficiency of the evidence is concerned, reduces itself to this: The voluntary killing of deceased is established by sufficient proofs and is admitted by the defendant. This being so, a *prima facie* case of murder in the second degree was made out, and it devolved upon the defendant to show facts which would justify, excuse, or mitigate the killing. If his account of the transaction given at the trial was true, it was clearly a case of justifiable self-defense, but the jury were not obliged to accept his account, and evidently they refused to do so. Their action in this respect was due, no doubt, to a belief that the testimony of the defendant was inconsistent with former statements by him, or with facts which they found to be satisfactorily established by the evidence. Among such former statements was a brief account of the affair contained in a letter from the defendant written shortly after his incarceration. In this letter he makes no mention of the fact testified to at the trial, that the deceased made an attempt to draw his pistol before he made any attempt to bring his rifle into position for firing. Another statement made to the surgeon who performed the autopsy was that he stood on the right side of deceased when he fired the fatal shot. This statement he subsequently corrected, and at the trial testified in effect that the left side of deceased was turned toward him during the affray. The first opinion of the autopsy surgeon was that the ball had entered from the left side, but he afterward concluded, and at the trial testified, that it entered from the right side—the right side of the neck instead of the left lower jaw. This was a very important point, and the evidence upon it conflicting, but if the jury believed—as they probably did believe—that the point of entrance was on the right side, they may, for this reason alone, have rejected the defendant's version of the affair. There were some other cir-

cumstances, of very slight importance in themselves, but of sim-
ilar tendency, and, such being the case, this court cannot set
aside the verdict upon the ground that there is no evidence to
support it.

In regard to the errors assigned upon the rulings and actions
of the superior court we note, in the first place, a charge, more
than once repeated in appellant's brief, that the trial judge first
suggested and announced the theory of lying in wait behind the
stump, which, it is said, was thereafter adopted by the pros-
ecution. This complaint appears to us wholly unfounded. The
evidence in the record shows that the district attorney had made
elaborate preparation before the trial to prove the facts upon
which the ambuscade theory was founded, and we entertain no
doubt that it was fully developed in his opening statement of the
case. Moreover, it was clearly indicated in the examination of
the witness Thomas, which occurred before the court made any
reference to the matter. This is a reflection upon the trial court
which counsel should not have permitted themselves to make.

It is contended that the superior court erred in overruling
objections of defendant to the admission in evidence of maps and
photographs of the scene of the homicide, and especially of the
evidence given in that connection as to the position of the hollow
stump, as to the relative elevations of the stump and junction of
the trail, as to the fact that there was an unobstructed view from
the one point to the other, et cetera.

The court did not err in admitting this evidence, the manifest
purpose of which was to sustain the theory of lying in wait. The
facts surrounding the killing were certainly material, and the
topography of the spot where the killing occurred was clearly
relevant. It was not for the court, but for the jury, to determine
what theories could be justly founded on such facts.

Neither did the court err in the remarks made in overruling
these objections. When objection is made to offered evidence
that it is irrelevant, the court cannot overrule the objection with-
out saying, in effect, that the evidence has some tendency to
prove some material fact; and we cannot see that the defendant
is injured by a mention of the fact to which the evidence is
relevant, especially when, as in this instance, the court clearly
states that it is the sole province of the jury to determine whether
such fact is proven.

With respect to all these matters, it may also be said that the verdict of murder in the second degree conclusively shows that the jury must have discarded the theories of the prosecution as to lying in wait, et cetera—for upon those theories the defendant was guilty of murder in the first degree. It is more likely that the verdict was based upon some such hypothesis as that stated in the following passage from the charge of the court:

"If, on the contrary, you believe from the evidence, beyond a reasonable doubt, that the defendant went to the scene of the homicide expecting and intending there to meet the deceased, with the sole purpose then and there of creating appearances justifying the deceased in making a deadly counter attack in self-defense, and that he did in fact then and there create such appearances, and that the deceased did in fact then and there make a deadly counter attack in self-defense, and the defendant then and there slew him, such killing was without justification under the law, unless the defendant before so killing deceased had first and in good faith declined further combat, and fairly notified deceased he had abandoned the contest. And if the circumstances were such, arising from the suddenness of the counter attack, that he could not so notify him, it was defendant's fault and he must take the consequences."

It is contended on the part of appellant that it was error to give this instruction, not only because there was no evidence upon which to base it, but because the principle is not correctly stated. We do not think the instruction misstates the law of the case supposed, but it is not so easy to say that there is evidence to sustain the hypothesis. Defendant, it is true, admits that he armed himself with a rifle because he apprehended that he might meet the deceased on the road and might be called upon to defend his life, and in the letter above referred to he seems to admit that his own movement to bring his rifle into a position for ready use is what caused the deceased to commence firing. But there is no direct evidence that he went to the scene of the homicide with the sole purpose, or with any preconceived purpose, of creating appearances which would bring on a conflict. That particular part of the instruction, however, which supposes a deliberate purpose on the part of defendant to create appearances becomes immaterial in view of the verdict acquitting

him of murder in the first degree; and it is only important to consider· whether the court was justified in submitting an instruction based upon the hypothesis that the defendant, without any preconceived design, did in fact create appearances justifying a deadly counter assault by deceased. Upon this point it cannot be said that there was a total lack of evidence to sustain the court in submitting the question to the jury.

It is claimed that the superior court erred in allowing Dr. Iglick to give his opinion as an expert upon the question of exit and entrance of the bullet. The doctor had been a practicing physician and surgeon for fifteen years, but had never had but one case of gunshot wound, and in that case there was only a wound of entrance; but he had taken a regular course of lectures on medical jurisprudence, had studied the standard authorities on the subject of gunshot wounds, had read the reports of our army surgeons on the subject, and had himself conducted the autopsy in this case, so that he was not only able to express a general opinion in answer to a hypothetical question, but was able to state the particular grounds upon which his opinion in this case was founded. There was, we think, a sufficient foundation laid to warrant the court in admitting his testimony. Its value was a question for the jury.

There was, perhaps, a technical error in the rulings of the court with respect to the witness Ring. He was called for the purpose of proving threats by deceased made in the course of a conversation with the witness. The court sustained objections to the proof of what the witness had said in the course of the conversation, upon the ground that only what the deceased had said was material. This is not strictly true, for it was not only material to show what the deceased actually said, but much more material to show the true meaning and significance of what he said, and this would not always appear with one-half of the conversation suppressed. But, in this case, the particular portions of the conversation which the court succeeded in excluding do not seem to have been essential to an understanding of all that deceased had said, and parts of it were clearly irrelevant. The witness contrived, in spite of the rulings of the court, to tell the whole story, so that, whatever the error in the ruling, there was no prejudice to the defendant.

The defendant, at the proper time, moved to set aside the in-
dictment upon the ground that he had not been held to answer
at the time the grand jury was impaneled, and in that connec-
tion challenged the panel as well as an individual grand juror
upon statutory grounds. But the court denied his motion and
refused to entertain the challenge upon proof of the fact that,
although the defendant had not been held to answer at the time
of the formation of the grand jury, he was, at that time, in actual
custody, charged with the murder by sworn complaint, and had
been brought into court before the grand jurors were sworn,
and offered the privilege of challenging, which he had declined
to exercise. The ruling of the court in refusing to entertain
the challenge or dismiss the indictment is fully sustained by the
construction given to the statute in *People v. Geiger,* 49 Cal. 650,
from which we do not feel at liberty to depart.

Defendant's motion for a new trial was based partly upon the
ground of misconduct of some of the trial jurors, and of newly
discovered evidence.

It seems that the jurors were allowed to separate during the
trial, and it was shown by affidavit that one of the jurors was
seen in "earnest conversation" with a brother of the deceased
on the day before the trial closed. The evidence is conflicting
as to whether the conversation was in a public place, but it ap-
pears that it was out of hearing of any third party. One of de-
fendant's counsel also made an affidavit five days after the verdict
that he had been informed that another of the jurors had pub-
licly stated during the progress of the trial that the defendant
ought to be hanged. Upon these affidavits he moved for a post-
ponement of the hearing of the motion for a new trial and for
the issuance of subpoenas for the jurors referred to, in order
that they might be examined as to their alleged misconduct.
This application was denied, and the motion for a new trial
overruled.

We cannot say that this ruling was error calling for a reversal
of the judgment, although we do think it would have been a
wise exercise of the discretion of the court to investigate fully
these charges of misconduct. It was not legal misconduct in a.
juror to engage in conversation with a brother of the deceased
upon a subject disconnected with the case on trial, but it was

a grave impropriety, exposing the juror to suspicion and reflecting upon the administration of the law. It is not going too far to say that his conduct called for explanation. But this was a matter resting in the discretion of the trial court, and, since it does not appear that the conversation related to the case on trial, we cannot hold that there was abuse of discretion. As to the other juror, the evidence was hearsay, and, considering the time that had elapsed subsequent to the alleged public declaration of his opinion, and the fact that no person was named who had heard it, the court was justified in disregarding the charge.

The newly discovered evidence was that of Davis, with reference to the box of Winchester cartridges above referred to. This was a matter so closely related to the evidence given by Davis at the trial that the court may reasonably have concluded that it should, as it clearly might, have been called out upon cross-examination at that time.

Exception was taken to certain rulings of the court admitting evidence of experiments made by direction of the prosecution for the purpose of contradicting the testimony of some of defendant's witnesses. The testimony related to sounds heard in the night-time in the vicinity of defendant's cabin. The experiments were conducted at the same place, but in the daytime, and it was not shown that the atmospheric conditions—such as humidity, temperature, et cetera—were the same. The court did not err in admitting this testimony. The principal conditions were the same, and the jury could weigh and make allowance for the differences referred to. They affected the weight, but not the competency, of the evidence.

The last point to be considered is the alleged misconduct of the district attorney. It is charged that the district attorney was unfair to several of defendant's witnesses, that he was uncandid in his presentation of evidence, that he persisted in charging and insinuating acts and motives upon the part of defendant which were wholly unsustained by the evidence, and that he endeavored to prejudice the jury by asking defendant himself, on cross-examination, questions which he must have known he had no right to ask, and the only design of which was to insinuate charges against the defendant which could not have been proven on a trial of this indictment, even if true.

It is true that the district attorney asked some of the witnesses for defendant questions which implied a low estimate of their character, but they were in the line of a cross-examination the evident purpose of which was to discredit their testimony. It was the privilege and even the duty of the district attorney to discredit these witnesses if he believed they had testified falsely. If he abused his privilege, the jury must have seen it, and the prejudice was to his own case, not to that of the defendant. The same thing may be said with reference to the offer to prove the finding of a cartridge box in a valise belonging to deceased. It is quite possible that the district attorney was himself deceived in that matter. If it was clear that he was not deceived, the jury must have seen it, and he must have suffered all the prejudice.

The acts and motives charged against defendant were a part of the theory or theories of the prosecution. We have indicated our opinion that several of those theories found but slight, if any, support in the evidence, but the prosecution had a right to urge them. It was for the jury to pass upon all such matters.

The district attorney had no right to read the telegram from the sheriff of Placer county while cross-examining the witness Zuver; but the defendant had an opportunity of objecting to it, which he failed to do. It seems to have been read with his tacit consent, and there was no protest or exception at the time.

The most serious fault committed by the district attorney was in his cross-examination of the defendant with reference to his testimony to the effect that he started to Sierra City on the day of the homicide for the purpose of having the deceased put under bonds to keep the peace. The following extract from the record will show what then occurred:

"Q. But you would want to get to Sierra City before it was dark and back home again if you were afoot? A. That depends—yes, sir, if I was going home; if not, I might stay in Sierra City. I made up my mind to put him under bonds that day on account of the recent occurrences and of his actions, and I had an opinion back in July to do so, and I determined to do so.

"Q. Then, why didn't you? A. Well, I had reasons that I didn't care to do it.

"Q. You knew what it was to be put under bonds? A. I did.

"Q.  You knew what it was to be put under bonds yourself?

"Judge Soward.—We object; I also charge misconduct on the part of the district attorney.

"Mr. Wehe.—You are awful tender of this defendant.

"Judge Soward.—I charge that as misconduct also.  You want to try this case and no other.

"The Court.—I don't think it is proper to inquire whether the defendant had been under bonds."

The questions here asked appear to us, as they evidently appeared to the trial judge, to contain an insinuation that the defendant was himself a man of violent character who required at times to be put under bonds.  If so, the questions were highly improper, and ought to have been known to the district attorney to be improper.  But the offense was not so flagrant as in itself to constitute ground for reversal.

The judgment and order of the superior court are affirmed.

Garoutte, J., Temple, J., Harrison, J., and Henshaw, J., concurred.

McFARLAND, J., concurring.—I concur in the judgment and in the opinion of the chief justice.  I desire to say, however, that if the testimony were to be considered simply as it stands in the cold printed record, without any reference to the appearance, manner of testifying, et cetera, of the witnesses, I would not feel sure in holding that it warranted a conviction.  But the credibility of the witnesses rests with the jury, and, as it depends upon many things which cannot be reproduced here, I do not feel that this court would be justified in setting aside the verdict on the ground of want of evidence.  I agree with the chief justice that there were no errors of law calling for a reversal.

Rehearing denied.