[Civ. No. 739. Third Appellate District.—October 31, 1910.]

## MYRA M. CLARK, Respondent, v. TULARE LAKE DREDGING COMPANY, Appellant.

NEGLIGENCE—ACTION FOR DEATH OF MINOR SERVANT—CONFLICTING EVIDENCE—SUPPORT OF VERDICT.—In an action for the death of a minor servant caused by the alleged negligence of the defendant as his employer, in which the jury found, upon conflicting evidence, that the proximate cause of the death was the culpable negligence of the defendant, upon appeal taken, it is the duty of the appellate court to treat all of the facts brought out by the evidence which are necessary to support the verdict as having been found by the jury as true; and it is held, upon a careful examination of the record, that the evidence is sufficient to support the verdict, and to render it immune from attack.

ID.—LAD EMPLOYED FOR OTHER WORK ASSIGNED TO DANGEROUS WORK—LACK OF QUALIFICATION—SUBSTITUTE FOR ADULT ABSENTEE.—It appears that the case is that of a lad of tender years and immature

judgment, who had been assigned to other work of very remote, if any, danger, and who was without experience in handling complicated and dangerous machinery, and who was placed, at an hour of the night when he ought to be asleep, in charge of the most dangerous part of the machinery as a substitute for an adult absentee, which work he was not qualified to perform, and while assisting another adult in restoring a removed cable on unguarded machinery, without adequate light, he was caught in the machinery and lost his life thereby, it being admitted by the president of the company that if the adult employee had not been absent, the boy would not have lost his life.

ID.—VOLUNTARY ACTION OF LAD—FORCED DUTY—NEGLIGENCE A QUESTION FOR JURY.—Assuming that the lad acted voluntarily and without direction in assisting to restore the cable, it still remained for the jury to say, from a consideration of all the evidence, whether he acted negligently or without due care in the performance of a duty, which it clearly appears, from the fact of his having been taken from the service for which he was expressly employed, and placed in charge of that part of the dredger where the greatest degree of danger existed, was forced upon him by those in authority.

ID.—CONTRIBUTORY NEGLIGENCE—BURDEN OF PROOF.—The burden was upon the defendant to establish, by a preponderance of the evidence, its defense of the contributory negligence of the deceased, and that such negligence was the proximate cause of the accident and death.

ID.—CONTRIBUTORY NEGLIGENCE NOT PROVED—NEGLIGENCE OF DEFENDANT SHOWN.—It is held that there is no direct evidence showing contributory negligence on the part of the deceased; that the precise manner in which he received his death is not shown by the record; but that on the other hand there are circumstances from which the jury could, with good reason, infer negligence on the part of the defendant, and that the accident would not have occurred, to the loss of the boy's life, but for such negligence.

ID.—ACTS OF NEGLIGENCE OF DEFENDANT.—The act of the defendant in putting the deceased in charge of the dangerous machinery under the circumstances was negligence, even if it be true that the boy was warned that this unusual position involved a hazardous undertaking, it appearing that there was the absence of bright lights on the dredger, and the absence of usual guards on the spider-wheel in which the foot of the deceased was caught.

ID.—BURDEN TO SHOW ADEQUATE WARNING AND APPRECIATION OF DANGER.—The burden was upon the defendant to show that those in authority over the dredger not only warned the boy of the danger attendant upon the discharge of the duties of a "deck-hand" having charge of the principal machinery of the dredger, but also to show that, if such warning was given, it was so given that the deceased fully appreciated and realized the danger by which he was surrounded.

ID.—QUESTION FOR JURY.—It was for the jury to say, from a review and consideration of all the evidence, whether deceased was warned by his superiors of the danger or risk to which he was negligently subjected, and if so, whether the warning was such as to properly impress upon his judgment a full appreciation of the hazard.

ID.—PROVINCE OF JURY.—The jury are the exclusive judges of the credibility of the witnesses, and they are not bound to accept as true or sufficient the warning of danger given to the deceased.

ID.—AWARD OF DAMAGES NOT EXCESSIVE.—It cannot be said, in view of all the facts, that in this action by a mother for the death of her minor son, that a verdict for $5,000 was excessive, or beyond what the evidence justifies as fair and just compensatory relief. The jury were not only authorized to consider the pecuniary value of his services to the plaintiff, but also that she was deprived of the comfort, society and protection of her son.

ID.—DISCRETION OF JURY AS TO DAMAGES.—The element of loss of society, comfort and protection of the son to be reckoned in determining the pecuniary value of the services of the deceased to his mother is difficult to measure in mere dollars and cents, and manifestly must, with the whole question of damages, be left to the good sense and sound discretion of the jury, to be exercised in the light of all the circumstances of the case.

ID.—PROBABLE VALUE OF SERVICE.—It was the duty of the jury to award to plaintiff an amount which would justly compensate plaintiff for the probable value of the service of the deceased until he would have attained the age of twenty-one years, taking into consideration the cost of his support and maintenance from the time of his death until he would have reached that age.

ID.—EDUCATION OF SON.—The parental duty of educating the son, and his desire to help along his own education cannot affect the time spent at school from being considered as service of the son to the plaintiff.

ID.—MOTIONS FOR NONSUIT PROPERLY DENIED.—Motions for nonsuit based upon the alleged ground of contributory negligence of the deceased were properly denied.

ID.—EVIDENCE—REFUSAL TO ALLOW INSPECTION OF DREDGER BY EXPERT. Evidence was admissible to show the refusal of the persons in charge of the dredger on which the deceased was killed to allow an inspection thereof by an expert witness for the plaintiff. It was properly proved as a circumstance tending to disclose an effort on the part of the defendant to suppress or conceal pertinent facts from being presented to the court and jury.

ID.—POWER OF COURT TO ORDER INSPECTION.—The court, which had power to order an inspection by a jury, did not transcend its power or authority in ordering defendant to allow plaintiff's expert to examine the machinery and give testimony relative thereto.

ID.—PROPER INSTRUCTION—DUTY OF EMPLOYER TOWARD INEXPERIENCED
   SERVANT.—The court properly instructed the jury that "where a
   master employs a servant to do dangerous work or to do work that
   must necessarily require him to move in and about moving machin-
   ery of a dangerous nature, who, from youth, inexperience, igno-
   rance, or want of capacity, may fail to appreciate the danger sur-
   rounding him at such work, it is a breach of duty for the master
   to expose such servant, even with his own consent, to such danger,
   or to place him in a position where it shall become necessary for
   him to encounter the same, without first giving him such full and
   complete instructions as will enable him to fully and completely
   comprehend them and to do the work safely, and with proper care
   on the servant's part."

ID.—CHARGE CORRECTLY STATING LAW.—It is held that the entire charge
   of the court, taken as a whole, stated to the jury the law applicable
   to the issues fully, fairly and correctly.


APPEAL from a judgment of the Superior Court of
Kings County, and from an order denying a new trial. John
G. Covert, Judge.

The facts are stated in the opinion of the court.

Dixon L. Phillips, for Appellant.

Frank H. Short, and H. P. Brown, for Respondent.

HART, J.—This is an action for damages for the death
of a minor son of plaintiff, alleged to have been caused
through the negligence of the defendant, a corporation.

The cause was tried by jury. The plaintiff, in her com-
plaint, claimed damages in the sum of $10,000. The jury,
however, returned a verdict for the sum of $5,000, for which
amount the court entered judgment in favor of plaintiff.

· This appeal is from the judgment so entered and from
the order denying defendant a new trial.

The general points made by appellant are that the evidence
does not support the verdict; that the court erred, to the
prejudice of defendant, in the admission and rejection of
certain testimony, and that the court erred, to defendant's
damage, in giving and refusing to give certain instructions
and by the modification of others which were requested by
defendant.

14 Cal. App.—27

The specific contention with respect to the specification of the insufficiency of the evidence to uphold the verdict is that the proofs disclose that the proximate cause of the accident by which the deceased received the injuries culminating in his death was his own negligence, and upon this ground a motion for a nonsuit was, upon the close of the case for plaintiff, presented and urged by defendant, said motion having been denied by the court. A similar motion on the same ground was made and denied on the close of. the case by both sides.

The consideration of this point will, of course, necessitate a careful scrutiny of the testimony, particularly so in view of the fact that a coemployee of deceased was the only other person present—one John Burnett—when the accident occurred and was, therefore, the only living eye-witness who was or could be produced at the trial.

It appears that the deceased, Ray Clark, at the time of his death, was a minor of the age of sixteen years and six months, approximately. He had been for a few weeks prior to his death an employee of defendant on its dredger, which was being operated in Tulare Lake, in Kings county. On the first day of May, 1907, while thus engaged, according to the averments of the complaint and the undisputed evidence, his foot "was so caught and entangled in a large shaft (connected with said dredger) and the machinery running and operated thereby that his foot and leg were crushed, broken and mangled," and from the effects of the injuries so received he died on the second day of May, 1907.

From the evidence it further appears that the deceased was one of three children of the plaintiff, from whom the father of said children had been separated and had lived separate and apart for some eight years prior to the trial of this action, and had during that period contributed nothing toward the support of his family.

At the time of the employment of the deceased by the defendant, and for some time prior thereto, the plaintiff resided with her children and her aged mother near Merced, although the deceased, at the time he accepted, through his mother, employment with defendant, was and had been for some time attending school in the city of Fresno.

The accident causing the death of the deceased happened at about the hour of 2 o'clock in the morning, the deceased and said Burnett, the coemployee to whom we have referred, being at that time on the night "shift."

As stated, the deceased was, through plaintiff, employed by the defendant in the month of April, 1907. As to the circumstances of said employment, the plaintiff testified: "Mr. Lewis [president of defendant] said that he wanted him for a lever-man. I asked him if he thought he could do it. He had already seen the boy, and he said yes, he thought he could do it nicely. That he seemed to be a fine-looking boy, and he was well pleased with him, and that he would teach him how to do it or have him taught. And that it was perfectly safe place up in the lever-room, and that he was going to put him to work in the lever-room. He asked me if the boy—or rather it came up in the conversation, if the boy knew anything about machinery. I told Mr. Lewis, no, he did not, and I wanted him to be put in there where there was no danger. Mr. Lewis said there was no danger. That he liked the appearance of the boy and would teach him. Ray asked me about going to work for Mr. Lewis; I told him yes. He wanted to go and earn some money to finish up his schooling and help me; I told Mr. Lewis that, and he told me that he would take good care of Ray, and that his wife would look out for him. I told him the boy hadn't been away from home much."

The witness, C. E. Traves, gave the details of a conversation with defendant's superintendent, had prior to the time at which negotiations for the employment of deceased were carried on with plaintiff, in which the proposed employment of the boy and the character of the duties which it was proposed that he should perform on the dredger were discussed. The witness testified: "I am fifty-two years old; my occupation or business is mechanical engineer and machinist. Have had about twenty-five years' practical experience in mechanical engineering. I know Mr. Lewis, I know Mrs. Clark, and I know the boy that was killed. Mr. Lewis came to my place of business at Fresno and wanted to get a man. I told him I didn't know of any, but I knew a good boy. I asked him what he wanted him for, and he said he wanted him to handle levers, and I said to handle levers on what,

and he said on the dredger, down to our dredger. I said this boy has no .experience, but he is willing to learn and he is about the only support of his mother. And he said we don't want experienced hands, because the captain would rather have the men and break them in, as he gets better men than we do with some man that is already broke in. So I brought the boy down, or sent the boy down, rather. I told Mr. Lewis that the little boy did not know anything about machinery; that he was inexperienced, but that he wanted to learn and was ambitious and wanted to learn. Mr. Lewis replied that he wanted a lever-man. Mr. Lewis said there was no danger whatever above in the lever-room and that it would require but very little skill. He said it was away from the machinery and above, the lever-room was.''

Burnett, the coemployee of and on duty with deceased when the accident happened, described the dredger as follows: ''Its hull is probably fifty or sixty feet long, and about twenty or twenty-five feet wide. There is a bulkheading around it and an open space in the front part, and the engine is on the inside of that and the shaft just in front of the engine; forward and on the outside of the bulkheading is the turntable and boom; above the roof in the forepart is the lever-house and cables from the drums running through sheaves at the end of the boom and makefast to the clamshell bucket; . . . there are three levers in that lever-room, but only two operated, and there is a lever that is operated by the boat; there is no other machinery in this lever-room; these levers operated the machinery that is down below; that is, it operates the friction where the drums are, operates the drum that rolls and reels up the cable to hoist the bucket and to swing the boom around. . . . The levers operate certain machinery that is inside the inclosure, and the machinery consists of drums and spools. . . . In describing to the jury the spools and drums that are operated by these levers I will do so in relation to the location of the engine. The engine is located on the inside in the central part. The engine transmits the power to the cogwheels. I am not much of a machinist, and it is pretty hard for me to remember. Just in the fore part of the engine there is a wheel— a cogwheel—as near as I can remember, and connected with

that is a larger cogwheel directly in front of it.'' Further
description of the machinery and its operation will appear
from this witness' testimony respecting the circumstances
immediately preceding and attending the accident, from
which it will further be observed that as to the precise man-
ner in which the accident happened Burnett was unable to
furnish any particular information—that is to say, that
the witness could not tell exactly how the foot of the de-
ceased was caught in the spider-wheel. This paucity of in-
formation may be accounted for in the fact that, when the
accident occurred, both deceased and Burnett were engaged
in attempting to readjust or restore to its proper place a
steel cable which had left its groove on the drum, and doubt-
less their minds and attention were entirely absorbed by that
performance. We will, however, present the story of the
accident, as far as he was able to describe the circumstances
thereof, as related by Burnett himself on the witness-stand.
After giving his age as twenty-five years and stating that
he worked on the dredger in the capacity of a lever-man
before and at the time Ray Clark was killed, and declaring
that there was very remote danger involved in the operation
of the levers, this witness testified, in part, as follows:

"At the time Ray was killed, we were trying to clear a
'fouled' cable. It is a steel cable on a drum, and it should
run in its proper groove. Each turn of the cable should
run alongside of the other preceding turn. But, instead of
that, it got outside in some manner of itself, and that turn
got twisted in some way, became fouled—that is what I
mean by being 'fouled.' . . . That spool goes around and
takes up the cable, and this spool by revolving it became
fouled, the cable became crossed over and was piling up. . . .
In the first place, there was a noise, a sort of knocking noise,
that seemed to come from the end of the boom, and I be-
lieve I called Ray to stand on the fore part of the dredger
to see if he could locate what was wrong. I believe that
he went aft; I couldn't say, but I believe when I came down
he said that the cable was fouled on the drum, and we went,
I believe, to try to clear it. . . . I don't remember what
we said. I know that we decided that we would try to
clear the cable; don't remember what words we said, though.
. . . Well, we got bars; something to pry the cable over to

its proper place. . . . And part of the time I tried to get the slack of the cable in the fore part. I tried to get the slack pulled in of the cable while Ray was trying to clear it with the bars on the drum. And I believe he stepped upon this block (which was located within a few inches of the wheel in which deceased's foot was caught), and in some manner got his foot in the spider-wheel that was revolving just back of him and was taken over and crushed. . . . The wheel is located directly in front of the engine. . . . It is called a spider-wheel; I suppose it is made of cast-iron, but in the center the standards or spokes are wider than at the top. I think the diameter is about two and a half feet, and it is connected with what we call a friction which jams into the other wheel—it is a friction-wheel, but there was no immediate connection between the wheels and the lever. . . . Q. Tell us the dimensions of that wheel, or any of those wheels around there, if you can. A. Well, I have down here two feet seven and a half inches, the diameter of the wheel. . . . It might not be exact measurement, but quite close, I believe. I took this measurement at the time the wheel was actually revolving. . . . The length of that block that Ray was standing on, the place where he was standing, is eighteen inches. That is in the place for him to stand where he was standing; that is the entire length of the block. That is from the bearing to the end of the block where he was standing was eighteen inches. The block is located between the drum and the wheel, that is what I call the spider-wheel, which is about two feet seven and a half inches in diameter. . . . The distance from the block to that wheel in the center is from an inch and a half to three and a half inches. This block was lying, horizontally, alongside of the wheel, that is, fore and aft. . . . The wheel is attached to a shaft, . . . and revolves the long way of the dredger. . . . The block that I have mentioned was also lying the long way of the dredger. . . . The distance from the block to the center of the wheel is an inch and a half—that is, from the center of the wheel— the parts, the ends or rim of the wheel, it would be three and a half inches. . . . At the time Ray was busy unfouling this cable I was bringing down the slack of the cable; that is, pulling from forward, aft toward the drum. I know that I was just about in front of the drum. I was probably two

or three feet, maybe four feet, away from him; I was mov-
ing around at the time. He was facing the side of the
dredger and so was I. I was looking practically in the same
direction as he was and pulling on this cable for this slack,
so he could pry off the cable and make it move properly.
We did not succeed in clearing the cable because the acci-
dent occurred. . . . When Ray was caught in this wheel he
cried out, and as soon as I turned around to my right I saw
him going over the wheel, and I jumped around and stopped
the lever and pulled him out and called for help. The time
that elapsed between the time that I first heard his cry for
help and the time I succeeded in stopping this wheel from
rotating was just a few seconds, just as quick as I could get
to the engine to stop it; just as soon as the engine stopped
the wheel stopped. The engine probably made one or two
revolutions after shutting off the distillate, then stopped.
This engine makes about twenty revolutions a minute. When
I got back to where Ray was I pulled him clear of the wheel.
There was no one else there when I got there. His legs
were underneath the wheel and he was lying flat on his
back; he was lying back on the deck on his back and his
legs were underneath this wheel; he was lying there. The
wheel, I think, is about three or four inches off of the deck,
as near as I can remember, that is the outer rim of the
wheel is about four inches above the floor of the deck. . . .
I think Ray, when endeavoring to release the cable, was
standing over here in the fore part of that block. I believe
that he had both feet on the fore part of it, but he would be
moving around half of the time, and maybe at some time
he was standing with both or one foot across there, but I
am not certain, as I was looking the other way; but at times
he was standing with one foot on one side and then shifted
one to the other, shifting his position. I don't remember
seeing him standing that way. We were moving around
and I was looking the other way at the time.'' Continuing,
Burnett declared that he was not in charge of the machinery
of the dredger on the occasion of the fatal accident; that his
duties at that time were to operate the levers in the lever-
room, and that Ray Clark was, on said occasion, the ''deck-
hand,'' and as such had charge of the machinery. He testi-
fied that it was the duty of the deceased to ''oil the ma-

chinery and watch and see that nothing went wrong, nothing got heated down below there. . . . Ray also run the engine and supervised the machinery and was doing this at that time." He stated that the dredger was lighted fairly well, although he admitted that, being oil lamps, they did not produce a particularly brilliant light. A hand lantern was necessary to be used about the dredger after dark. He admitted that when the machinery did not work as it should, he, "being older than Ray, assumed the lead. . . . Ray was running the engine on the dredger on that watch, of course. That watch consists of myself and Ray Clark, a deck-hand, just two of us, and the watch was from 12 at night to 6 in the morning—six hours' work. . . . This was not the first dredger of that kind that I ever worked on. Previous to working on this dredger, I worked on other dredgers near Stockton, where they built dredgers, and then I worked as a fireman on the dredger."

On cross-examination Burnett said that "there was plenty of room on the floor of the deck for him to stand there and do this prying with the bar on this cable," the inference from this statement being that deceased would then have been in a position in which his foot could not have come in contact with the spider-wheel. The block on which deceased stood was some eighteen inches higher than the deck floor. Burnett had no distinct recollection whether the wheel in which deceased's foot was caught had guards around it or not.

The witness, Traves, who is a practical machinist, visited and inspected the dredger during the trial, and, after describing the machinery by which the dredger is operated and the manner of its operation, testified that the wheel in which the deceased's foot was caught had no guards around it. "I examined the machinery carefully this morning," he continued, "and know how it is assembled and put together, and I know the usual practice of guarding and protecting such machinery as I saw there." He further testified that there was no other way in which the deceased could have done the work which it was necessary for him to do to replace the cable in its proper groove than in the very manner in which he did attempt it. He said that he might have gone "clear around the dredger and come back on the other

side," but that, had he done so, "he would have to step up on the same place and do the same work on this side. He couldn't do that very well on account of that large gear. There is a number of other gears going there; he couldn't get in there in the first place."

The plaintiff testified in rebuttal that, after the death of her son, she held a conversation with Lewis, president of defendant, relative to her son and the manner of his death. She said that Lewis "said he was sorry that the accident occurred, but that wouldn't bring back my boy. He said that he did not intend to keep him there; that the boy wasn't capable of that work, and that he had a man engaged to take that place, and that man had been allowed to go to a picnic, I believe, at Laton. He said that if the man had been there that day you would have your boy. It seemed to be fate. I remember his using that particular word, that it seemed to be fate in the way I lost the boy. That this man wanted to go to that particular picnic, and he let him go. That he didn't intend to keep Ray at all. He did not consider him competent to do that work, and was not intending to keep him there." In this connection, it may, at this time, pertinently be stated that Lewis admitted having in substance said to Mrs. Clark, on the occasion referred to by her, that "he had another man engaged to do the work that Ray was doing the day he met with the accident, but that this man wanted to attend a picnic at Laton, and that if he had not gone down to the picnic, her boy would have been living yet."

For the defense, Lewis, president of the corporation defendant, testified, in part, as follows: "A day or two before I saw Ray at Corcoran, I saw Mr. Traves, the witness in this case, at a shop in Fresno. . . . I asked Mr. Traves if he knew of any experienced lever-man, and he said no. I told him I could use some gas-engine men, and that they could have an opportunity to learn, and that Mr. Huntington [general superintendent of the dredger] had told me I could get better lever-men by learning them aboard the machine than by shipping them down from the city. . . . Mr. Traves said he did know some young men, and he said one of them had been in the shop that morning. He said he didn't know but what he would see him again, probably, and send him

down. I told him all right, send him down. I told him that we paid $40 a month and board to beginners—we paid $60 a month at that time to experienced *lever-men;* that a man qualifying himself as lever-man would get a raise in pay. . . . After I saw Ray at Corcoran, that I have just spoken about, I saw Mr. Traves that same day in Fresno. I think I went to his shop. He was doing some work for us. At all events he brought Mrs. Clark and introduced her to me in the afternoon at the Santa Fe depot. . . . I liked the looks of the boy, and thought he would make a good subject to make a lever-man of and have an opportunity to learn the levers, and if he got proficient in that he could get lever-man's wages, which was $60 per month. Mr. Huntington was superintendent of construction and had control of things generally under me. Ray was a well set-up youngster; he told me he was about a certain age and he looked it. He was a bright boy, intelligent looking, and his movements were quick. I think he was about five feet four or five inches in height and might have weighed one hundred and forty pounds. I thought I would give him an opportunity to learn the work, and when Ray went to the dredger to work they put him to running the gasoline engine on the dredger. I did not direct his work on the dredger at all. I did not give any instructions to the men about him. The boy was on watch twelve hours a day. The rate of wages that the defendant was paying were allowing the deceased for his work on the dredger during the time that he worked there was $40 per month.''

C. T. Huntington, general superintendent of the dredger, stated that his business was that of the assembling of machinery for dredger work, and the construction "and placing in operation dredgers and particularly what is called clamshell dredgers. . . . In this state I have been working on dredgers of this kind for about twelve years in all capacities, from fireman to captain, and during the last four years I have been superintendent of the construction and of the assemblying of the machinery itself. . . . When Ray Clark came there to go to work the most of the machinery was to be assembled, and this shaft that is spoken of had not been assembled. Ray was there and working from the 10th of April, 1907, and he was helping the crew assemble the machinery. . . . Before I began to try out the machinery to

test it, to see whether it would do the dredging, I instructed each man individually to be very careful about getting around any moving portion of the machinery, explaining to him that a gas-engine couldn't be stopped instantly, and to get caught in the machinery meant a serious accident. ... . When we went or started to operate the dredger to see whether it would do the work Ray was doing what we call deck work. That is to say, his duties consisted of looking after the gas-engine and machinery, and oiling the machinery at regular intervals, and keeping general supervision of things and to see that everything ran smoothly on deck. I gave instructions to the deck-hands and to Ray Clark that in the event that anything should happen or go wrong, or serious trouble, they were to call me. . . . I had occasion to say something to Ray Clark about going in and about that machinery; I spoke to him as I spoke to all the rest, cautioning him. . . . After I had given these instructions to Ray and all the others in the first instance, I did not say anything further to Ray about going about the machinery.''   On cross-examination Huntington said: ''If I said on my direct examination that I showed Ray how to start the gas-engine, I didn't mean it. I don't remember having said that, and if I did say it, I am mistaken. . . . It is dangerous to go near this revolving wheel which is left uncovered; and it is not usual to guard such wheel, and it is entirely unnecessary.''

T. Wiley, who testified that, after the machinery was assembled and placed on the dredger, ''the work that was assigned to me and my duties were nothing in particular and everything in general,'' said that, ''as it was brought to my notice that Ray Clark was inclined to be careless about dangerous machinery, I told him personally, over and above collectively to the crew, that it was dangerous, certain parts of it were dangerous, and especially these wheels that were turning in close proximity to those pedestals. I mean by these wheels the spider-wheel, because they were shown to me very distinctly and pointed out, and I carried out my orders to that effect.''   By cross-examination of this witness, it developed that he had ceased work for defendant, and that at about the time preparation was being made for the trial of this action he was stopping in Los Angeles. He said, referring to Lewis, president of defendant, ''I wrote him

about two months ago that I would like to go down on the Colorado river, and he wrote me, saying he wanted me to make an affidavit before I left. I wrote him that I would rather take charge of the dredger, so I got a telegram from him about two weeks ago to come and take charge. We started up the dredger just about a week before this suit commenced. I am at present captain of the ship and have the supervision of the whole matter, and at night-time I am not disturbed for minor things that happen, and I am not called when the cable is foul, as it was when Ray was killed. *If the cable is fouled those in charge have to disentangle it.* (Italics ours.) . . . I have had about twenty-five years' experience in running machinery.''

Testimony, offered by both sides, was received by the court as to the height and weight of deceased. Lewis said that, in his opinion, the deceased was about five feet four or five inches in height and ''might have weighed one hundred and forty pounds.'' In this connection, he declared that Ray was a lad of intelligence and appeared from his talk to be familiar in a general way with machinery.

Wiley expressed the opinion that deceased was about five feet six or seven inches, and that he would weigh about one hundred and fifty pounds; that ''he was well built, a stout young man.''

Plaintiff testified that she knew exactly the height and weight of her deceased son at the time of his death, and said that ''he was just a fraction of an inch shorter than I am,'' and that he weighed one hundred and thirty-eight pounds and that ''he was not fleshy.''

Francis Cunningham testified: ''I measured plaintiff's height this forenoon. She is exactly five feet, two and three-quarters inches in height. And I consider that a correct measurement, as I used the same measure as I use in registration.''

We have now presented, in substance, a fair statement of the evidence from which the jury reached the conclusion, under the court's instructions containing the law pertinent to the case, that the proximate cause of the death of plaintiff's minor son was the culpable negligence of the defendant.

But, as stated, the defendant vigorously protests that the evidence clearly discloses gross negligence upon the part of

the deceased, and that but for such negligence he would not have met with the accident which cost him his life.

Upon most all the salient facts in the case there is a conflict 'in the evidence, but it is, of course, the duty of this court to treat all the facts brought out by the evidence which are necessary to support the verdict as having been found to be true by the jury, notwithstanding the fact that there may be evidence in flat contradiction of such facts. Obviously, under our system, the jury are the exclusive judges of the weight of all evidence and the credibility of all witnesses, and it is, as has often been repeated, peculiarly within their right and province, when considering the evidence, to give to it whatever weight it may in their deliberate judgment be entitled to, or, if it be their judgment that it is entitled to no weight in the determination of the ultimate issue, disregard it altogether. 'And, having done this in a given case, their conclusion cannot be questioned by an appellate court, if there be nothing to show that their verdict has been planted upon evidence which is, on its face, or inherently, improbable and unbelievable.

While a verdict returned for defendant on the evidence before us would undoubtedly stand upon a firm foundation, viewed from the standpoint of an appellate court, we, on the other hand, doubt not that a careful examination of the record by the light of the constitutional provision limiting the power of appellate tribunals in this state to the consideration of questions of law only, can lead to no other conclusion than that the evidence displayed before us is sufficient to render the conclusion of the jury immune from successful attack here.

We have before us a case where a lad of tender years, of immature judgment and without previous experience in dealing with and in handling complicated and dangerous machinery, at an hour of the night when a boy of his age should be conserving by sleep his developing physical power, is put in entire charge, according to the only witness to any of the circumstances attending the accident, of the most dangerous part of the machine or the dredger on which he was employed, after having been expressly engaged to perform other service—that of a lever-man—the performance of which was attended by very remote, if any, danger, according to Burnett. He had then had, let it be noted, only three weeks' experience of any character on a clam-shell dredger.

Lewis, president of the defendant, himself testified that he employed the boy as a lever-man, and the plaintiff testified that Lewis promised her, when the contract of employment was made, to assign the deceased to duties on the dredger in the execution of which he would be free from danger of accidents. Lewis further admitted, at least in effect, that the day the lad lost his life he was engaged in performing the duties of another employee, who had absented himself from the dredger for the purpose of attending a picnic. He said to plaintiff, after the tragic death of her son, that had said other employee remained on duty that day the deceased "would have been living yet." The irresistible inference from this statement is, it seems to us, that the deceased had been assigned to duties on the day of the accident which he was not only not employed to perform, but which he was not in truth qualified to perform. Burnett, who, though called as a witness for the plaintiff, apparently displayed little disposition to squarely and unhesitatingly detail the circumstances of the accident, said that the deceased was in charge of the deck and the machinery on that night. It is true that this witness stated that, when the cable became disarranged, he and deceased "mutually decided" to attempt restoring it to its proper groove on the drum, the manifest purpose of such statement being to convey the impression to the jury that deceased voluntarily and without suggestion by or direction from the witness, took the part that he (deceased) did in assisting in an attempt to restore the cable to its proper place. But, assuming that the deceased acted in the matter largely, if not entirely, upon his own initiative and volition, it still remained for the jury to say, from a consideration of all the evidence, whether he acted negligently or without due care in the performance of a duty which, it clearly appears, from the fact of having been taken from the service for which he was expressly employed and placed in charge of that part of the dredger where the greatest degree of danger existed, was forced upon him by those in authority.

It must be borne in mind that the burden was upon the defendant to establish by a preponderance of the evidence, its defense of contributory negligence by deceased and that such negligence was the proximate cause of the accident and its direful consequences. There is no direct evidence showing

negligence on the part of the deceased. The precise manner in which he received the injuries which produced his death is, as before stated, unknown so far as this record is concerned. On the other hand, there are circumstances from which the jury could with good reason infer negligence on the part of the defendant and that the accident would not have occurred and the boy's life forfeited but for such negligence. To begin with, the act of the defendant in putting the deceased in charge of the machinery under the circumstances was negligence, even if it be true that the boy was warned that this, to him, unusual position, involved a hazardous undertaking. Then there is the testimony of Burnett to the effect that the lights on the dredger at the time of the accident were not "particularly bright," and the testimony of Traves that the spider-wheel in which the deceased's foot was caught was without the guards usually placed about such wheels.

The burden was upon the defendant to show that those in authority over the dredger not only warned the boy of the danger attendant upon the discharge of the duties of a "deckhand" having charge of the principal machinery of the dredger, but it was also incumbent upon it to show that, if such warning were given, it was so given as that the deceased fully appreciated and realized the danger by which he was thus surrounded. And, at last, it was for the jury to say, from a review and consideration of the whole record, whether the deceased was warned by his superiors of the danger or risk to which he was negligently subjected, and if so, whether such warning was such as to properly impress upon his judgment a full appreciation of the hazard.

It is very clear from the verdict, that the jury concluded either that such warning, if given, was not sufficiently explicit and specific to influence the judgment of the deceased in any perceptible degree, or, in other words, not so comprehended by him that he fully realized the danger surrounding him, or that deceased was not cautioned at all by his superiors. It is no answer to say that, no one having been produced to directly contradict the testimony of Huntington and Wiley with regard to cautioning deceased about the danger of the machinery, the jury were not authorized to find that either no caution or insufficient caution was given. How can this court determine how the testimony of Huntington and Wiley on this

point impressed the jury? It may be that the very manner of giving their testimony was itself, in the judgment of the jury, a complete contradiction of the truth of their statements. It may be (and who can gainsay their right to have done so?) that the jury felt justified in disregarding *in toto* the testimony of these witnesses. And, if they did, may an appeal court declare that they were wrong in so doing and in effect say to the jury: "You misinterpreted the manner in which these witnesses testified; you should have given their statements full weight and credit, and as no other testimony was brought before you directly contradicting them, you should have found that the deceased was sufficiently warned as to the great danger of the machinery to have fully put him on his guard"? And so would this court be compelled to hold if we were to say that the testimony of Huntington and Wiley should have been, in the absence of direct contradictory proof, accepted by the jury as conclusive upon this point. And thus would this court clearly invade the province of the jury by passing upon the weight of testimony and the credibility of witnesses. Our code explicitly declares that the jury are the exclusive judges of the credibility of witnesses (Code Civ. Proc., sec. 1847) ; that they are the judges of the *effect* and *value* of evidence addressed to them, except when it is declared to be conclusive (Code Civ. Proc., sec. 2061), and that they "are not bound to decide in conformity with the declarations of any number of witnesses, which do not produce conviction in their minds, against a less number or against a presumption of other evidence satisfying their minds." (Code Civ. Proc., sec. 2061, subd. 2.) No one has ever doubted the right of a judge or jury to believe one witness as against another, where they have testified in direct opposition to each other, and the power and right of the judge or jury, in dealing with questions of fact, is no different and no less where the witnesses all testify one way, and when a verdict has been returned in opposition to the testimony of all the witnesses, such verdict, it seems clear to us, must be accepted by appellate courts in this state as a rejection of such testimony on the ground that it is unworthy of belief and weight, unless from the face of the record itself it can be said that the jury's action is inherently unjustifiable. And interference with a verdict by an appeal court because it appears on the face of

the record on appeal to be opposed to the testimony of all
the witnesses cannot be, logically, any less an invasion of the
province of the jury than if there appeared to be a direct
substantial conflict in the evidence.  It often happens, it may
be said as a matter of common knowledge, that the most com-
plete and conclusive contradiction of the truth of a witness'
testimony is his own manner on the witness-stand when giving
it.  And it is the very fact that juries and trial judges have
the peculiar advantage of determining whether witnesses have
contradicted themselves, not in terms, but by their manner of
testifying, that has given rise to the familiar rule that appel-
late courts will not and cannot set aside verdicts of juries or
findings of a trial court based upon evidence in which there
appears to exist a substantial conflict.  It is the duty of this
court to conclude that the jury either attached no weight to
the testimony of Huntington and Wiley to the effect that they
cautioned the deceased, or that, although they might have
cautioned him, the deceased was not thus made to clearly
realize and appreciate the great danger lurking in the power-
ful complicated machinery of which he was negligently put in
charge.

It was, furthermore, for the jury to determine, from all the
facts and circumstances, whether the deceased, in taking the
position near the spider-wheel for the purpose of prying or
attempting to pry the cable back to its groove, acted under
the directions of Burnett.  The latter, it is true, testified, as
we have seen, that he gave deceased no directions, but that
they "mutually decided" to act in a certain way; yet, Bur-
nett was older than deceased by about ten years, and had had
some previous experience with dredger machinery, having
been employed on other dredgers.  This fact, we doubt not,
was known to the deceased, who perhaps recognized the for-
mer's superior knowledge of such machinery and of how to
handle and replace parts which had become disarranged.
Burnett admitted that "in these cases (referring to occasions
when the machinery became disarranged), being older than
Ray, I assumed the lead."  From all the circumstances it is
not difficult to understand how the jury could have justly
come to the conclusion that Burnett "assumed the lead" on
the occasion of the accident and directed the course and move-

14 Cal. App.—28

ments of deceased in the attempt to rectify the difficulty with
the cable.

But no useful purpose can be subserved by pursuing this
question further. It must suffice to say that we have ex-
amined the testimony with extreme care, and have thus been
led to the discovery of no just reason for interfering with
the verdict upon the proposition that there is insufficient evi-
dence to justify it.

Nor can we say that the verdict is excessive or beyond what
the evidence justifies as fair and just compensatory relief.

The boy was, at the time of his unfortunate death, lacking
in his majority by four and a half years. Plaintiff testified
that he had contributed, and was, when killed, contributing
to her support. She was entitled to this during the remaining
four and a half years of his minority. The earnings of the
lad during these remaining years of minority cannot, as is the
assumption, justly be computed alone upon the wages he was
receiving at the time of his death. One of the witnesses, Will-
iams, an engineer by occupation, testified that the services
which young Clark was performing when killed were reason-
ably worth the sum of $85 per month. Besides, it is proper
to assume that had he lived and continued in the employment
for which he was originally engaged—that of lever-man—
he would, as he progressed in skill in that capacity, be en-
titled to an increase in salary from time to time until he would
have received the highest rate paid for such services. He was,
according to the witnesses, intelligent and apt at learning,
and the jury were the sole judges of what, from all the evi-
dence, his probable earnings would be during the remainder
of his minority had he lived. Moreover, the jury were au-
thorized, as the court properly instructed them, to consider
and take into account, as an element affecting the pecuniary
value of the service of deceased to the plaintiff, the fact that
plaintiff has, by his death, been deprived of the comfort,
society and protection of her son. (*Beeson* v. *Green Moun-
tain etc. Co.*, 57 Cal. 38; *Lange* v. *Schoettler*, 115 Cal. 388,
[47 Pac. 139]; *Harrison* v. *Sutter St. R. R. Co.*, 116 Cal. 156,
[47 Pac. 1019]; *Fox* v. *Oakland Con. St. Ry.*, 118 Cal. 67, [62
Am. St. Rep. 216, 50 Pac. 25]; *Dyas* v. *Southern Pacific Co.*,
140 Cal. 308, [73 Pac. 972].) And, obviously, this element
of loss of society, comfort and protection of the son to be

reckoned in determining the pecuniary value of the service of the deceased to his mother is difficult to measure in mere dollars and cents, and manifestly must, with the whole question of damages, be left to the good sense and sound discretion of the jury to be exercised in the light of all the circumstances of the case. As is said by the authors of Graham and Waterman on New Trials, page 451, "in cases of this class there is no scale by which the damages are to be graduated with certainty. They admit of no other test than the intelligence of a jury, governed by a sense of justice. It is, indeed, one of the principal causes in which the trial by jury has originated. . . . The law that confers on them this power and exacts of them the performance of this solemn trust, favors the presumption that they are actuated by pure motives. It, therefore, makes every allowance for different dispositions, capacities, views and even frailties in the examination of heterogeneous matters of fact where no criterion can be supplied; and it is not until the result of the deliberations of the jury appears in a form calculated to shock the understanding and impress no dubious conviction of their prejudice and passion that courts have found themselves compelled to interpose." (See *Scally* v. *W. T. Garratt & Co.,* 11 Cal. App. 147, [104 Pac. 325], and cases therein cited.)

It was the duty of the jury in this case, as the court in its charge clearly told them, to award to the plaintiff "an amount which would justly compensate plaintiff for the probable value of the service of deceased until he had attained his majority, the age of twenty-one years, taking into consideration the cost of his support and maintenance from the time of his death until he would have reached the age of twenty-one years," and we perceive no just reason arising from the record for holding that the verdict, under all the circumstances appearing, represents anything beyond a fair and reasonable admeasurement of the compensation to which plaintiff is entitled for the damage she has sustained.

There is very clearly nothing in the argument that, because the boy, prior to his employment by defendant, had been attending school, and that the purpose he had in view in seeking and securing employment was to earn means by which he might be able to give himself the advantages of an education, the time served in his attendance at school and the service he

rendered to further his purpose in that laudable direction could not be considered as service of the minor to the plaintiff. No more important and imperative duty rests upon parents than that of giving their offspring the advantages of a sound educational foundation, and the earnings of a minor dedicated to such purpose become for that reason no less the result of service to the parents than if he should turn them over directly to those naturally responsible for his custody, care, maintenance and education to be used for some other purpose within the scope of the duties of the parents as such.

2. There are forty-one assignments of error involving the court's rulings upon the evidence. We cannot give, nor is it necessary to give, all these special attention in this opinion. We shall, however, notice some of the exceptions on this score, and as to the others—indeed, as to all—it may be said generally that we have discovered in them nothing prejudicial to the rights of the defendant.

The motions for a nonsuit were based upon the alleged ground that the evidence shows that the accident in which the deceased lost his life was proximately occasioned by his own negligence. The view which we have expressed respecting the point that the evidence does not justify the verdict is a sufficient answer to the contention that the exceptions to the court's adverse rulings on said motions are well taken.

Exception No. 2 is addressed to the ruling of the court allowing the witness, Burnett, to answer the following question over the objection of defendant: "You remember having a conversation with Ray Clark, just a short time before the accident occurred, and saying that the reason they didn't have more lights there (referring to the dredger) was because they were afraid of an explosion?" The witness denied having had such a conversation with the deceased at the time mentioned, and, even if the question called for testimony which was for any reason improper, manifestly no harm could have resulted to the defendant either by the question or the answer.

The witness, Williams, with a view of becoming a witness for plaintiff, made an effort to go aboard the dredger for the purpose of inspecting the machinery and thus equipping himself with such knowledge as would enable him to describe to the jury the dredger and the operation of its machinery. He was accompanied by counsel for plaintiff and one of the lat-

ter's surviving sons.    The parties in charge of the dredger
at the time would not permit them to go upon the dredger.
Plaintiff introduced Williams to show the attitude of the em-
ployees of defendant in this matter, and the court, over an
objection by defendant, permitted the witness to testify that
the officers in charge of the dredger had flatly refused to allow
him to inspect and examine its machinery while in motion or
at all.    It is claimed that the allowance of said testimony was
prejudicial error.    We do not think so.    Williams is a ma-
chinist and a stationary engineer, and it was proper to admit
testimony which would bring clearly before the minds of the
jury a description of the character of the machinery which
the defendant had put the deceased in charge of and the
nature of the operation of said machinery, for the purpose of
illustrating the probable manner in which the accident oc-
curred.    The refusal by the defendant's employees to permit
this inspection, knowing, as they did, the purpose for which
it was to be made, was a circumstance, whether of much weight
or little weight it matters not, tending to disclose a disposi-
tion on the part of the superintendent or captain to prevent
plaintiff from presenting as complete a case as the circum-
stances would permit.    It was, in other words, a circumstance
having a direct tendency to establish an effort on the part of
the defendant to suppress testimony, and there has never been
any doubt that testimony showing or tending to show an at-
tempt upon the part of a party to a suit to cover up, conceal
or otherwise prevent pertinent facts from being presented to
the court or jury is competent and proper.

Exception No. 16 involves the action of the court in making
an order that a witness for plaintiff be allowed to inspect or
examine the machinery.    It is contended that the court acted
in excess of its authority in making this order and thus com-
mitted error which was damaging to the defendant's rights.
There is, so far as we know, no express provision of law au-
thorizing the course adopted by the court.    But every court
has certain inherent power—power which, exercised within
reasonable and proper limits, authorizes it to go beyond its
express powers where the interest of justice imperatively de-
mands such a course.    Moreover, by section 128, subdivision
5, of the Code of Civil Procedure, every court is in general
language clothed with full control and power over every per-

son connected with a judicial proceeding before it, in so far as said proceeding is concerned, and we fail to see in the action of a court compelling the production of any relevant and competent testimony which will make clear or tend to make clear the truth as to a disputed question of fact anything in contravention of either the letter or spirit of subdivision 5 of that section of our code. We perceive no distinction between the proposition here and the one presented and discussed in the case of *Johnston* v. *Southern Pacific Co.,* 150 Cal. 536, 540, [89 Pac. 348], where, in an action for personal injuries, the trial court was appealed to by the defendant for an order allowing the plaintiff to be examined as to her injuries and the effect thereof by physicians of the defendant's own choosing, testimony bearing upon that subject having been given by physicians who had been employed by and were introduced as witnesses for plaintiff. The court denied this application upon the ground that it had no power to make the order, and on appeal the supreme court held that the ruling was erroneous; that the court was authorized to make said order by virtue of the provisions of subdivision 5 of section 128 of the Code of Civil Procedure, *supra,* and quotes, approvingly, the following from the case of *Wanek* v. *City of Winona,* 78 Minn. 98, [79 Am. St. Rep. 354, 80 N. W. 851]: "To allow the plaintiff in such cases to call in as many friendly physicians as he pleases, and have them examine his person and leave him wholly at the mercy of such witnesses as the plaintiff sees fit to call constitutes a denial of justice too gross in our judgment to be tolerated for one moment." (See the innumerable cases in *Johnston* v. *Southern Pacific Co.,* 150 Cal. 536, [89 Pac. 348], cited to this point and in confirmation of the rule laid down in the Minnesota case.)

In the case at bar, the only eye-witness to the accident was an employee of defendant. In fact, as counsel for plaintiff suggested at the trial, the plaintiff was compelled to secure her witnesses "from the ranks of the defendant." As stated, we see no difference in principle between the action of the court in the case at bar in ordering defendant to permit an expert witness for plaintiff to examine its machinery and the order which the supreme court declares that it was prejudicial error for the trial court to have refused to make in *Johnston* v. *Southern Pacific Co., supra.* Most certainly the same reason

exists why the court in this case should have made the order complained of as exists for making an order for the purpose for which the order in the cited case should have been made. If the testimony relative to the nature and character and construction and operation of defendant's machinery had been confined exclusively to that received through defendant's own employees, it is safe to say that the jury would have received an unsatisfactory description of the general and the particular situation on the dredger on the occasion of the accident as to all the important objective or physical facts that might or did tend to reflect some light on the manner and circumstances of the accident. And the testimony of the expert, having been confined to a description of the machinery and the manner of its operation, could no more operate prejudicially against the rights of the defendant than a diagram or a model of the machinery, a familiar method adopted by courts for clarifying testimony otherwise not easily or readily understood. Furthermore, the court could, in the exercise of its discretion, have ordered an inspection of the machine by the jury (Code Civ. Proc., sec. 610), and, manifestly, this course would have involved greater risk of error than that pursued by the court. Our conclusion is, that the court in no manner or degree transcended its power or authority in ordering defendant to allow plaintiff's expert to examine the machinery and give testimony relative thereto.

3. Instruction No. 1, given to the jury by the court, and which is objected to as erroneous, reads: "You are instructed that where a master employs a servant to do dangerous work, or to do work that must necessarily require him to move in and about moving machinery of a dangerous nature, who, from youth, inexperience, ignorance or want of capacity, may fail to appreciate the danger surrounding him, at such work, it is a breach of duty for the master to expose such servant, even with his own consent, to such danger, or to place him in a position where it shall become necessary for him to encounter the same without first giving him such full and complete instructions as will enable him to fully and completely comprehend them, and to do the work safely, and with proper care on the servant's part."

The foregoing instruction is founded upon language used in the case of *Foley* v. *California Horseshoeing Co.*, 115 Cal. 184,

[56 Am. St. Rep. 87, 47 Pac. 42], and very clearly states the law with regard to the duty imposed upon a master in his relations as such with a minor in his employ as a servant. That there is a well-defined distinction between the duty resting on a master toward a minor in his employ and the duty he owes to an adult servant, is a proposition thoroughly settled both in principle and by the cases.

In the case just referred to the facts are strikingly similar to those in the case at bar. There the minor, who was of the age of fourteen years, was originally "employed by defendant to punch holes in horseshoes by means of a machine known as a horseshoe punching machine." Subsequently the boy was ordered by an assistant foreman of defendant "to adjust a portion of the mechanism operating the punching machine," to adjust which involved a hazardous undertaking. Plaintiff was not "familiar with the mechanism and the manner of adjusting the same, and was ignorant of the hazard." The boy, obeying the order thus given him, was engaged in correcting the defect when the machine, by reason of said defect, was suddenly set in motion and the injuries complained of were thereby sustained. It was contended that plaintiff, according to his own testimony, "knew the special danger and risk which, because of the defective appliance, must have attended the working of the machine, and that, having this knowledge, and his injury having resulted from this known defect, he stood as an adult with respect to his master's liability from any injury arising from it, and cannot recover."

In reply to this contention, Mr. Justice Henshaw, in characteristically clear and forceful language, thus states the rule in cases of this character: "The question of the taking of a risk, the question of the assumption of responsibility in a given act, is determined as much upon the matter of judgment as upon the matter of knowledge. . . . Children are taught obedience. They are taught not to oppose their will and their judgment to those in authority over them; but in addition to this, and more important than all, the judgment of the child is the last faculty developed. . . . Knowledge he may have; facts he may acquire; but the ability to apply his knowledge or reason upon his facts, comes to him later in life. The very accidents of childhood come from thoughtlessness and carelessness, which are but other words for absence of judgment. . . .

Their conduct is to be judged in accordance with the limited knowledge, experience and judgment which they possess when called upon to act, and it must, from the nature of the case, be a question of fact for the jury, rather than of law for the court, to say whether or not, in the performance of a given task, the child duly exercised such judgment as he possessed, taking into consideration his years, his experience, and his ability.'' (See, also, *O'Connor* v. *Golden Gate,* 135 Cal. 545, [87 Am. St. Rep. 127, 67 Pac. 966] ; *Mansfield* v. *Eagle Co.,* 136 Cal. 622, [69 Pac. 425] ; *Killelea* v. *California Horseshoe Co.,* 140 Cal. 605, [74 Pac. 157] ; *Fries* v. *American Lead Pencil Co.,* 2 Cal. App. 148, [83 Pac. 173].)

Instructions 2, 3, 4, 5, 7 and 15, which are also criticised, involve substantially the statement in different language of identically the same principle that is enunciated in the first instruction, and we need not, therefore, give the assignments as to them special attention.

Against the court's instructions there are other criticisms in which we see no merit.

The entire charge of the court, taken as a whole, stated to the jury the law applicable to the issues fully, fairly and correctly.

After an exhaustive examination of the record, we have not been able to discover any reason which would justify interference with the judgment and order appealed from.

For the reasons herein given, the judgment and order are affirmed.

Chipman, P. J., and Burnett, J., concurred.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on December 27, 1910.