[Crim. No. 167.   Third Appellate District.—March 25, 1912.]

# THE PEOPLE, Respondent, v. THOMAS P. HAYDON, Appellant.

CRIMINAL LAW—MURDER—SUFFICIENCY OF EVIDENCE TO SUPPORT VER-
DICT — INCONSISTENCIES OF WITNESS TO CRIME.—Where, upon a
prosecution for murder, the verdict was evidently based mainly upon
the evidence of the brother of the deceased, as an eye-witness of
the crime, it is held that, notwithstanding inconsistencies ˙in his
statement as to matters of detail, it cannot be said that there was
anything in his testimony as to the homicide from which the re-
viewing court could justly conclude that his entire testimony is
*per se* unbelievable, and could not, if accepted in the main by the
jury, warrant their verdict as against the defendant's story of self-
defense.

ID.—TEST OF INCREDIBLE TESTIMONY.—Testimony, in order to bear upon
its face such improbability as to render it unbelievable, must in-
volve a claim that something has been done that it would not seem
possible could be done, under the circumstances described, or in-
volve conduct that no sane person would be likely to do.

ID.—PROVINCE OF APPELLATE COURT AND OF JURY.—Appellate courts are
not authorized to review the evidence, except when, upon its face,
it may be justly held that it is insufficient to support the ultimate
issue involved, in which case it is not an issue of fact, but purely
one of law.   Such courts are in no position to determine the credit
of witnesses, or to weigh their testimony, which is the sole province
of the jury in a criminal case.   In the present case, the jury were
authorized, in the discharge of their duty, to accept the testimony
of the brother of deceased as to the facts of the homicide, however
weak it may be in other respects, and to reject any evidence con-
trary to his testimony as to such facts.

ID.—INAPPLICABILITY OF AMENDMENT OF CONSTITUTION TO REVIEW OF
CONFLICTING EVIDENCE.—The recent amendment of the state con-
stitution by adding section 4½ of article III thereof (Stats. 1911,
pt. II, p. 1778), prohibiting reversals in criminal cases for error,
"unless, after an examination of the entire cause, including the
evidence, the court shall be of the opinion that the error complained
of has resulted in a miscarriage of justice," is inapplicable where
no error appears in the case upon any question of law, and the
verdict is sustained upon conflicting evidence.

ID.—CONSTRUCTION OF AMENDMENT—PROVISION OF CONSTITUTION LIM-
ITING APPELLATE COURTS TO "QUESTIONS OF LAW" UNAFFECTED.—
The appellate court deems it certain that "said amendment was not
intended to change, nor has it changed, the very sensible rule pre-

scribed by the constitution, and for so many years adhered to in this state, that, in the exercise of their appellate jurisdiction, the appellate courts are restricted to the consideration of questions of law alone, and that therefore, as before stated, the matter of evidence does not constitute a subject of review by those tribunals except where there necessarily arises from the evidence, or is presented thereby, from its very nature, a question of law.

ID.—COMMENT BY SUPREME COURT IN ORDER DENYING REHEARING.—In the order of the supreme court denying a rehearing, in this case, that court commented thus on the foregoing statement of law: "This court regards this statement as wholly unnecessary to the decision of the case. The denial of the petition for a rehearing is not to be construed as an indication of approval or disapproval of said statement by the supreme court."

ID.—EVIDENCE—POSTAL CARD AS TO STRAYING CATTLE.—It is held that there was no error prejudicial to the defendant in the admission in evidence of a postal card received by the father of deceased from the owner of an adjoining range as to the whereabouts of his cattle, and on which the father, addressing his sons, had written a request that if they saw the writer, to "thank him for telling us."

ID.—CROSS-EXAMINATION OF BROTHER OF DECEASED—WOUND RECEIVED—RELATIVE POSITION—ERROR WITHOUT PREJUDICE.—It was error to reject a question asked on cross-examination of the brother of deceased as to whether his position was not on the left-hand side of defendant when he received two wounds in his right arm, for the purpose of making it appear that the shots were accidental, when he was firing at deceased, merely on the ground that the question was "purely argumentative"; but it is held that, in view of other evidence, the error was wholly without prejudice.

ID.—ADMISSION OF BLOODY GARMENTS OF DECEASED—CORROBORATION OF WITNESS FOR PROSECUTION—INTENTION OF MORTAL WOUND.—The court did not err in admitting in evidence for the prosecution the bloody over and under shirts worn by deceased at the time of the fatal shot, as part of the case for the prosecution, in corroboration of the evidence of the brother of deceased as to the homicide, and to show that the shot fired by defendant took effect in a vital part of the body, as indicated by the garments, and the intention of defendant to inflict a mortal wound.

ID.—SUSTAINING BURDEN OF PROOF—PEOPLE NOT REQUIRED TO ANTICIPATE POSITIONS OF DEFENDANT.—The people, in the maintenance of the burden upon them of proving the guilt of the defendant, are not bound to anticipate the contentions or concessions, if any, which the defendant intends to make, or to assume that certain matters or theories supporting the hypothesis of guilt will not be disputed by defendant.

ID.—ABSENCE OF DEFENDANT FROM CORONER'S INQUEST—EVIDENCE NOT PREJUDICIAL.—It was not prejudicial to the defendant for the prose-

cution to prove that he was not present at the coroner's inquest
held at the scene of the homicide, as there could be no implied
concession on his part of guilt, in such case, as there might be if
he were present and silent thereat.

ID.—BAD REPUTATION OF DECEASED FOR PEACE AND QUIET — PROPER
CROSS-EXAMINATION—LOCAL FACTIONAL DISPUTE.—Where evidence
was introduced to show that the reputation of the deceased for
peace and quiet in the community where his family resided was
bad, it was proper to allow the district attorney to ask, on cross-
examination, whether such reputation was not owing to a local
factional fight on the liquor question, not involving any other
question, although the deceased is not shown to have belonged to
one of those factions.

ID.—CROSS-EXAMINATION OF WITNESS FOR DEFENDANT—INTOXICATION
DURING TRIAL.—It may be shown from the cross-examination of
a witness for the defendant that he was, during practically all
of the time of the trial, under the influence of intoxicating liquors,
as bearing upon the witness' memory or want of memory as to the
testimony given by him, where the cross-examination showed jus-
tification for the inquiry.

ID.—EVIDENCE OF GOOD CHARACTER OF DECEASED FOR PEACE AND QUIET
— IMPROPER CROSS-EXAMINATION — ASSAULT UPON HONESTY AND
INTEGRITY.—Where a witness had testified to the general good repu-
tation of the deceased for peace and quiet, in a place where he
lived for three years, it was not admissible to inquire on cross-
examination as to incidents affecting his honesty and integrity.
Such inquiry was not relevant for any purpose. The true rule as
to character evidence, in a criminal case, is that it should be
confined to the trait of character in issue, and should bear some
analogy and reference to the nature of the charge.

ID.—UNFRIENDLINESS OF WITNESS FOR DEFENDANT TOWARD FAMILY OF
DECEASED—CROSS-EXAMINATION AS TO ENMITY—IMPEACHING EVI-
DENCE. — Where defendant admitted unfriendliness toward the
family of the deceased, but denied positive hostility, on cross-
examination the prosecution had the right to lay the foundation
for impeaching evidence that he was so hostile to them that he
had stated that he had leased land to the defendant in order that
he might kill the sons if they drove his horses off of the range.
The fact that such impeaching evidence had a far-reaching effect
against the witness is not a ground upon which impeaching evidence
may be excluded, the only remedy being to have its effect limited
by an instruction.

ID.—ABSENCE OF PREJUDICIAL ERROR IN RULINGS OF COURT.—It is held
that no prejudicial error appears in the rulings of the court upon
the admission or.exclusion of evidence, and that no ground appears
in the record for a reversal of the judgment and order appealed
from.

18 Cal. App.—35

APPEAL from a judgment of the Superior Court of Trinity County, and from an order denying a new trial. James W. Bartlett, Judge.

The facts are stated in the opinion of the court.

Bush & Hall, and C. William White, for Appellant.

U. S. Webb, Attorney General, and J. Charles Jones, Deputy Attorney General, for Respondent.

HART, J.—There are, generally speaking, but two points upon which reliance is based for a reversal of the judgment and order, from which the defendant, convicted of murder of the second degree, prosecutes the appeal to this court, viz.: 1. That the evidence does not justify and support the verdict; 2. That the court committed a series of serious and prejudicial errors in the allowance and disallowance of answers to certain questions propounded to the witnesses.

The defendant was prosecuted for the crime of murder on an information, filed in the superior court in and for the county of Trinity, by the district attorney of said county, it being therein alleged that he unlawfully and with malice aforethought destroyed the life of one Morris H. Norgard.

The only witness to the homicide, other than the defendant himself, was a brother of the deceased, Cervera Norgard, a lad of a little less than thirteen years of age at the time of the homicide. His, therefore, was the only direct testimony received on behalf of the people. The circumstances of the killing as detailed by him do not accord, as might naturally be expected, with the circumstances of the homicide as related by the defendant, and thus there arises a sharp conflict in the evidence bearing upon the circumstances under which the act of killing was committed. But counsel for the appellant, with full appreciation of the rule which admittedly has always heretofore applied, and which we think still applies where a verdict is challenged for insufficiency of evidence to sustain it and there exists a substantial conflict in such evidence, contend, nevertheless, that the testimony of young Norgard is, upon its face, so plainly improbable or unbelievable that this court, which, so it is asserted, must, of necessity, thus view the boy's version of the homicide and its

attendant circumstances, is compelled to say that there is in fact no evidence worthy of belief which is in any measure contradictory to the defendant's story of self-defense, and that, therefore, the result reached by the jury is wholly without substantial support.

1. The homicide occurred on the twenty-first day of December, 1910, in a region of Trinity county known as Long Ridge.

The deceased, at the time of his tragic death, was about twenty years of age and was the son of Chris. Norgard, who, with his family, resided at Covelo, in Mendocino county. The latter was, however, the owner of a stock range, adjoining that of the defendant, in Trinity county.

The defendant, about one month previously to the day on which the killing occurred, purchased from one John D. Wathen the latter's stock range. Shortly thereafter the defendant drove his band of horses to the Wathen range and, with his family, took up his residence on said place. At about the same time, the defendant, with one J. S. Rorobough, entered into an agreement whereby the first named was permitted to graze his stock on the latter's range, comprising a large area of land situated in the neighborhood of the Norgard range, and which said land he (defendant) was making preparations to buy under his said agreement with Rorobough.

Upon the Norgard range was a cabin, situated about two miles from the Wathen place, and in which the Norgard boys lived when engaged in looking after and caring for their father's stock grazing upon the latter's range.

It appears that a feeling of intense hostility had developed between the Norgards and John D. Wathen, who sold, as seen, his range to the defendant. Wathen had married the daughter of Chris. Norgard against the latter's wishes, and, while this fact was the ostensible genesis of the ill-feeling between them, it was the theory of the defense that the real motive for the hostility of the Norgards against Wathen was to so annoy and pester the latter as to inspire in him a desire to leave that region of country and thus, hoped the Norgards, they would be able to secure the ownership of the Wathen range, which they had for a long time coveted, for a price much below its actual value. The Norgards, so the defendant contends, therefore, kept up a persistent persecution of the Wathens

by various trespasses and other annoyances up to the time that the latter sold their range to the defendant. Actuated by a similar motive, so the theory of the defense proceeded, the Norgards, after the sale of the Wathen range to the defendant, transferred their ill-will and persecution to the latter and prosecuted a systematic and relentless harassment of the defendant (by running and stampeding his horses whenever they came across them) up to the day of the homicide.

The evidence discloses that, up to approximately a month prior to the death of the deceased, the latter had been engaged in some employment in Shasta county. His father, however, having requested him to return home and assist in looking after his stock on the Trinity county range, the deceased returned to Covelo, taking with him a new automatic "five-shot" rifle. A few days thereafter the deceased went to his father's range and with his brother, Elmer, there took charge of affairs and remained until the day of the homicide.

Cervera Norgard, the day before the homicide, went to the range, taking with him for his brothers and from his father a message, calling attention to the whereabouts of certain cattle belonging to the Norgards which had strayed from their range, information as to the whereabouts of said cattle having been communicated to Chris. Norgard by a neighboring land owner through a postal card.

As to the circumstances immediately leading to and ending in the homicide, Cervera Norgard testified, in substance, as follows: That, on the afternoon of the day of the homicide, he and the deceased mounted their horses and started out over the range to look after their cattle. The deceased carried the automatic rifle referred to in a scabbard attached to his saddle. After traveling about the range for some time, and just before sundown, they came across the horses of the defendant, grazing on their range. They at once proceeded to drive the horses off the range in the direction of the Wathen place. They had not gone far when they were fired upon by Haydon, who had suddenly and unexpectedly made his appearance "across the gulch," at a distance of about one hundred yards from the boys. Haydon fired twice at the boys at this time, but without effect. The witness declared that neither his brother nor himself paid any attention to this circumstance, neither accelerating their speed

by reason of the shooting, nor making any preparation to defend themselves, but proceeded, indifferently and leisurely, with the driving of the horses toward the Wathen place. The only comment upon the shooting at this time was made by the deceased, who remarked to the witness, "they [meaning the bullets] came close."

The witness said that they drove the horses "up the hill" to a trail leading to the Wathen range. After traveling over said trail for a short distance they came to a "flat," where they "let the horses go" and themselves started across the flat. They had proceeded only a very short distance when they again saw Haydon, this time standing behind a pine tree, with his gun in his hand. The deceased was riding ahead of the witness and, as they approached the pine tree, Haydon stepped out and called either the witness or his brother "a black s——n of a b——h." Haydon used some other bad language which the witness could not recall. However, neither of the boys made any reply to the defendant and started on in the direction of a pasture on their father's range, some two or three hundred yards from the pine tree mentioned. Haydon, although holding his gun in his hands, made no effort to use it at the pine tree. While the boys proceeded toward the pasture referred to, Haydon walked out to the edge of the flat, still holding his gun and watching the young men. After looking over the pasture from the hillside to which they had gone from the flat, the boys turned their horses and retraced their steps toward the flat and in the direction of the point at which the defendant was standing. When they had reached a point about fifty yards from the point on the hill from which they had viewed the pasture, the deceased removed his rifle from its scabbard and delivered it over to Cervera, saying: "Here is my gun, Cervera; I ain't afraid of Haydon, and don't want any trouble with him." When the boys reached the "flat," Haydon had returned to the pine tree behind which he stood when the boys first came into the "flat," and, as they were in the act of passing him, Haydon, addressing them, said: "Are you going to keep on driving my horses?" to which the deceased answered, "Yes, I will, if you are on our land," whereupon the defendant fired at the deceased. At this time, the witness was about twenty feet behind the deceased. Immediately

after the first shot was fired, the deceased turned toward his brother and exclaimed, "Run, Cervera; good-bye." A second shot was fired by Haydon, immediately following which the deceased fell from his horse. A third shot was fired by Haydon and Cervera's horse then commenced to rear. Cervera noticed blood flowing from the neck of his horse after the third shot. The witness, after the third shot, quickly dismounted and, with the rifle previously handed him by deceased, as noted, started to run toward the trail leading to the Norgard camp. The witness testified that the defendant fired two shots at the deceased and two or three at him. One shot took effect in the body of deceased, striking him in the breast and producing immediate death. The witness was shot twice in the right arm, fracturing it. One of these shots entered the forearm and the other in the upper arm. The horse upon which the witness was riding at the time of the shooting also bore two wounds in the neck, neither, however, being of a serious nature.

Cervera declared that neither he nor the deceased shot at the defendant, nor did they attempt to do so. He testified that, before meeting Haydon, the deceased fired a shot from his rifle at a quail and also one at a woodpecker.

The defendant's story of the shooting is, briefly, as follows: That, at about 3 o'clock on the afternoon of the day of the homicide, he left the Wathen place on horseback, taking with him a 25/35 Winchester rifle. He went "over on the ridge, west of the creek," where he could look down Eel river. After having been on the ridge a short while, he saw "somebody get around and put the dogs after" his horses and start them in the direction of the point at which he was standing. As the horses approached him he saw that Cervera and the deceased were driving them. When the boys came near where the defendant stood the latter, addressing them, said: "I want you fellows to quit running my horses," to which the deceased replied: "You go to h——l, you old s——n of a b——h. I will run your horses to h——l, you old s——n of a b——h." He then accused the boys of running the horses off the Rorobough land (under lease to defendant), and the deceased made a reply in language similar to that in which he first addressed the defendant. The boys then left Haydon and went "around the hill the way

the horses went,'' and in about five minutes thereafter returned to the point where they left Haydon. The latter was still standing at said point, holding his rifle in his hands. The deceased, so the defendant proceeded, had his rifle in his hands, and, passing Haydon a short distance, suddenly wheeled his horse so as to face the latter, and, speaking to the defendant, said: ''You old s——n of a b——h, you get out of here,'' and then fired a shot at the defendant. Haydon attempted to return the fire, but, there being no cartridge in his rifle, his weapon did no more, as under such circumstances it could, of course, do no more, than to ''snap.'' Immediately he placed a cartridge in the rifle and fired, both he and the deceased shooting at the same time. Again Haydon shot at the deceased and the latter thereupon fell from his horse to the ground mortally wounded. Cervera, continued the defendant, then jumped to the ground from his horse, picked up his brother's rifle and attempted to shoot. The defendant stepped behind a tree and as he did so Cervera fired a shot. The defendant then yelled to Cervera, ''You go on,'' and the lad thereupon left the scene of the trouble in the direction of his father's cabin. The defendant then left for the Wathen place.

We have now given a synoptical statement of the testimony of Cervera Norgard, upon which the state chiefly relied for the establishment of its case and upon which the jury in the main manifestly based their verdict, and also the story of the defendant as to the circumstances directly leading to and attending the shooting.

There was, it is true, other testimony introduced on both sides relating to the number of shots fired and heard by persons who at the time of the homicide were in the vicinity of the place where it occurred, and also involving certain declarations of the parties relevant to the issues before the court. This testimony, like that of Cervera Norgard and of the defendant as to the circumstances of the shooting, was conflicting.

But, as stated, the principal contention of the appellant with regard to the evidence is that the testimony of Cervera Norgard is inherently improbable, and that the jury, therefore, were unwarranted in believing it or basing a verdict against the accused upon it. This contention grows out of a

number of apparent inconsistencies developed by the cross-examination of the witness and of certain weaknesses which appear to inhere in the very story itself, as related by the boy. For illustration, much, in favor of the defendant, is sought to be made out of those portions of the boy's testimony in which he declared that, without warning or saying a word, the defendant first shot at them; that they (the witness and the deceased) paid no attention to those shots, but proceeded up the hill slowly and leisurely without making any reference to the incident, save the single observation by the deceased that the bullets "came close"; that neither looked back to see whether Haydon was following them, and that they did not, after that incident, cease driving the defendant's horses; that they returned from the pasture to the flat, going in the direction of the spot at which Haydon stood, whereas the evidence shows that they could then have avoided him, "either by continuing along the natural way across the flat, which would have carried them some ninety feet to the north of the tree where the defendant stood, or by going farther to the north across the hill, or by going south along a good trail under the flat." It is further pointed out as indicative of the inherent weakness and unreliability of Cervera's story that he testified that when the shooting commenced and the first shot was fired by Haydon, which evidently missed the deceased, the latter turned in his saddle to the left and, looking toward the witness (who had testified that at that time he was to the right of deceased) said, "Run, Cervera; good-bye," and then, having no weapon, turned and, again facing the defendant, received the shot that resulted in his death. "It is a tax upon one's credulity," say counsel, "to believe that, thus being assaulted, the deceased made no effort to defend himself, but upon being fired upon turned his back toward his assailant and bid his brother good-bye and then turned calmly to receive his death wound." These and many other like apparent and perhaps real contrarieties in Cervera's testimony, as well as contradictions of certain portions of his testimony by other witnesses, are set out and elaborated upon in the argument of counsel to justify a declaration by this court that the verdict of the jury is barren of a sufficient foundation to uphold it.

But, while the alleged variances or inconsistencies apparent
in Cervera's testimony and the contradictions referred to
undoubtedly afforded opportunity for a persuasive argument
to the jury against the reliability of Cervera's testimony, we
see in them nothing from which a reviewing court could justly
conclude that his entire testimony is, *per se*, unbelievable,
and that it was, therefore, the jury's duty not only to wholly
disregard it, but to accept the defendant's story of self-
defense, or at least find that the latter's guilt had not been
disclosed by the evidence to a moral certainty and beyond
a reasonable doubt.

It rarely happens that a case is presented on appeal in
which some inconsistencies in the testimony of certain wit-
nesses may not be discovered. These inconsistencies may be
due to various causes. It is perhaps quite true that in some
instances they are occasioned by the deliberate untruthfulness
of witnesses, but more often they are due, we apprehend, to
the forgetfulness of witnesses or perhaps to the fact that the
occurrences to which they have testified have come about
under circumstances that have put the witnesses in such a
state of excitement as to cause them to view the incidents
which they are required to describe as occurring in a some-
what different way from that in which they may have actually
occurred. It is commonly known that there seldom arises a
case upon the circumstances of which the witnesses precisely
agree in all respects, and yet it by no means necessarily fol-
lows that in such cases some one or more of the witnesses have
willfully given false testimony relative to the matter to
which they have testified. Some one or more may be mis-
taken, or, as often happens, some might have observed cir-
cumstances that others did not. But whatever may be the
cause of such differences, it is true that they occur in nearly
every case of disputed questions of fact. · If, therefore, every
case taken to the appellate courts were to be reversed because
of discrepancies or contradictions in the testimony of wit-
nesses without whose testimony a verdict of a jury or the
findings of a court could not be sustained, there would, indeed,
be few cases in which a reversal would not be compelled upon
the ground of the insufficiency of the evidence to support
such verdict or findings. Reviewing judges are, obviously,
in no position to determine the credit which should be ac-

corded to witnesses or to weigh their testimony. As has often been repeated, it is for this reason that our constitution provides that the appellate courts are not authorized to review evidence, except where, on its face, it may justly be held that it is insufficient to support the ultimate issue involved, in which case it is not a review of a question of fact, but purely one of law. In consonance with the spirit and intent of this constitutional provision, the legislature has ordained that the jury are the exclusive judges of the *credibility* of witnesses (Code Civ. Proc., sec. 1847), and are the judges of the *effect* and *value* of evidence addressed to them, except in those instances where it is declared by the law that it shall be conclusive proof of the fact to which it relates. (Code Civ. Proc., sec. 2061.) And, as a necessary corollary of the rules above noted, the jury in this case were authorized, if they conscientiously felt warranted in so doing, after full and fair consideration thereof, to reject any testimony which might have been contradictory to that of the witness, Cervera Norgard (*People* v. *Phelan,* 123 Cal. 557, [56 Pac. 424] ; *People* v. *Wright,* 4 Cal. App. 706, [89 Pac. 364] ; *People* v. *Turpin,* 10 Cal. App. 530, [102 Pac. 680] ; *Clark* v. *Tulare L. D. Co.,* 14 Cal. App. 414, 432, [112 Pac. 564]), and, therefore, to disbelieve the testimony of the defendant and accept that of Cervera as to the immediate circumstances of the shooting, however weak in places the latter's testimony may have been made to appear, or however sharply his testimony on other important points might have conflicted with the testimony of other witnesses.

But counsel for the defendant declare that the recent amendment to the constitution (sec. 4½, art. VI) has enlarged the power of appellate tribunals with respect to the review of evidence, and asseverate that the effect of that amendment has been (to use their language) "to revolutionize proceedings on appeal," and that "it is now the duty of appellate courts to weigh the evidence where the appellant relies upon the insufficiency of such evidence to warrant a conviction." There is nothing in this record demanding from us, even if this court were disposed to undertake the task, an interpretation of the meaning, intent, purpose and scope of the constitutional amendment to which counsel advert, and we shall, therefore, not attempt to do so; but if there is one prop-

osition in connection therewith of which we entertain no feeling of uncertainty it is that said amendment was not intended to change, nor has it changed, the very sensible rule prescribed by the constitution and for so many years strictly adhered to in this state, that, in the exercise of their appellate jurisdiction, the appellate courts are restricted to the consideration of questions of law alone, and that, therefore, as before stated, the matter of evidence does not constitute a subject of review by those tribunals, except where there necessarily arises from the evidence or is presented thereby, from its very nature, a question of law.

Guided by the rules as we thus understand them, we have examined the record in this case, and, therefore, as to the testimony of Cervera Norgard, we are justified in saying that we perceive nothing in his statements that he and the deceased paid no special attention to the alleged first shots fired by Haydon and that after such shots were fired they proceeded leisurely up the hill, driving Haydon's horses, without looking back to observe the defendant's movements, so startling as to render that portion of his testimony "inherently improbable," so that it may be held by an appellate court that thus, upon his evidence, upon which the verdict was chiefly founded, a question of law is presented. It may readily be conceded that it would seem unreasonable that the witness and the deceased, having been shot at twice by the defendant, made no preparation to defend or to shelter themselves against further assault by their antagonist. In other words, it would no doubt be regarded as unusual conduct upon the part of any sensible person to do and act as the witness testified that he and the deceased did and acted under the circumstances mentioned. But, on the other hand, it is not in a sense uncommon to find persons so imperturbable to physical fear that they will unflinchingly and desperately and, very often, unnecessarily, pursue a course of conduct involving the greatest physical peril to themselves and which the average person would not be guilty of. Yet we cannot see how it could be held, from the mere statement itself disclosing such conduct, that such statement is not true or is improbable upon its face. A statement, to bear upon its face the brand of improbability, or which may be said to be unbelievable, *per se,* must involve, we think, a claim that

something has been done that it would not seem possible could be done under the circumstances described, or involve conduct that no one but a person of a seriously calentured mentality would be likely to do. Again, let it be conceded that Cervera told an untruth when he said that he and his brother paid no heed to the shots first fired by Haydon; that he lied when he said that, after those shots, they proceeded up the hill without looking back to see what the defendant was doing; that he falsified when he said that, just before the fatal shooting, the deceased delivered to him the automatic rifle carried by the former in a scabbard; that it was not true that Haydon shot twice or three times at him (the witness) while the latter was fleeing over the trail leading to the Norgard camp, or that he shot at him at all; that the testimony of the witness at the trial was at variance in certain particulars with statements previously made by him or with his testimony at the preliminary hearing; yet those untruths, if untruths they were, and discrepancies between his testimony at the trial and that previously given, cannot be justly said to stamp the story of the witness as to the immediate circumstances of the fatal shooting of Morris Norgard by Haydon as improbable or inherently unbelievable. The matters referred to were, as stated, for the jury to consider in their determination of the ultimate question submitted for their decision, viz., whether the life of the deceased was taken under such circumstances as to make the act one of murder or manslaughter or whether they disclosed no crime at all. Haydon admitted shooting and mortally wounding the deceased, and the main controversy was as to the circumstances under which he did that act—whether he wantonly or without excuse shot and killed him or did the act in defense of his own person. If, therefore, the jury, as manifestly they did, believed the testimony of the witness, Cervera Norgard, in the main—if, indeed, they believed only that portion of his testimony bearing upon the immediate circumstances of the killing, and thus became satisfied beyond a reasonable doubt of the defendant's guilt, it was, of course, within their province to plant their verdict upon that particular portion of his testimony, although they might have regarded the statements of the witness on other points as of doubtful verity.

Under our view of the evidence the verdict is amply supported.

2. Cervera Norgard, having been asked by the district attorney why he went to Long Ridge a few days prior to the homicide, explained, in reply, that his father had sent him there with a message, to be delivered to his brothers, relating to certain of his cattle that had strayed from his range—a circumstance to which we have already adverted. This message was in the form of a postal card which had been received by Chris. Norgard at Covelo from the owner of a range situated in the neighborhood of the Norgard range, informing Norgard of the whereabouts of said cattle, and on which Chris. Norgard, addressing his sons, had written these words: "If you see Holtorf [the writer of the postal card] be sure and thank him for telling us." The postal card, in connection with Cervera's testimony, was offered by the people and, over objection by the defendant, admitted in evidence by the court. That portion of the postal card particularly objected to involved the request by Chris. Norgard that Holtorf be thanked for giving the information concerning the strayed cattle, and the argument directed against it is that, the prosecution having anticipated an attack by the defense against the character of the Norgard family generally, hoped to impress the jury that said family maintained a good standing with their neighbors, from the fact that one of such neighbors had taken the pains to notify them of the whereabouts of their strayed cattle. We have not been able to discover any particular or substantial purpose that could be subserved by the introduction of the postal card in evidence, since there is nothing in the record to indicate that Cervera went to the range for any other purpose than that stated by him, and since it is an undisputed fact that he was on the range on the day of the shooting and witnessed the fatal affray. Yet it is very clear that the mere fact that it was thus made to appear that Chris. Norgard desired that his gratitude be expressed to a neighbor for voluntarily giving him information concerning his missing cattle would not necessarily establish, nor could it even have a very strong tendency to establish, in the minds of the jury, a general good reputation for the Norgard family either for honesty and integrity or peace and quiet in the neighborhood in which the latter's range was situated.

In our opinion the postal card, as evidence, was without any force in any direction, except in so far as it tended to corroborate Cervera Norgard as to the purpose for which he went from Covelo to Long Ridge a day or two prior to the shooting; and for that purpose, it was, under the record, as already suggested, altogether unnecessary. There is no reference to the defendant in the postal and no language therein intimating that he was in any way concerned in the subject matter thereof, and from whatever angle the ruling admitting the card in evidence may be viewed, we can discover no possible harm that could have resulted to the defendant therefrom.

3. To the following question, propounded on cross-examination to Cervera Norgard by one of the attorneys for the defendant, the court sustained the objection that "it is purely argumentative": "As you ran anywhere from this cross [referring to a point marked on the map used at the trial] to the point directly north of the pine tree—in fact, all of the time your left side was directed to him [defendant], wasn't it?" The evidence disclosed, it will be remembered, that Cervera received two wounds in the right arm, his testimony being, as it will also be recalled, that, after mortally wounding Morris Norgard, the defendant shot at Cervera while the latter was running from the scene of the killing. The theory of the defense at the trial was, and it is so argued here, that the first shot fired by the defendant at the deceased, having missed the latter, struck Cervera, who was near the deceased at the time of the firing of said shot and in range of the bullet from defendant's rifle. The object of the cross-examination of Cervera in that particular was, therefore, to show that he did not tell the truth in his recital of the circumstances under which he received his wounds; that, as a matter of fact, instead of being shot while fleeing from the spot where his brother met his death, he was accidentally shot by the defendant as above related.

We do not think the question was improper or is amenable to the objection upon which the court disallowed an answer thereto, yet we think that the ruling was without prejudice for the following reasons: A map of the immediate vicinity in which the homicide occurred and on which all the important physical objects thereabouts were delineated and on which

the cardinal points of direction and the distances from one
to the other of the several important physical objects were
noted, was received in evidence and used in illustrating the
testimony.   By this map the witness, Cervera, gave his tes-
timony, pointing out thereon the respective positions of the
defendant, the deceased and himself at the times of the firing
of the several shots.   He thus illustrated the position of the
defendant and the direction in which he himself claimed to
have been going at the time, as he testified, the defendant
fired at him.   He testified that he did not know whether his
left side was toward defendant at the time of the firing of the
shots or not, but it is very clear that, from his description of
the respective positions of himself and defendant at that time,
by the use of the map referred to, there could be no difficulty
in determining whether his left or his right side was toward
the defendant at the time the  latter fired at him.   Even,
therefore, after showing on the map where the defendant
stood and where and in what direction he was running at
the time he was shot at, he should have given an answer to
the disallowed question contradictory to the description of
their relative positions as the same were pointed out by him
on the map, the jury would have readily discovered the dis-
crepancy and, under the circumstances, would not necessarily
have ascribed it to any intention on the part of the witness
to lie about it.   If, in other words, the witness, relying upon
his own unaided recollection, had said that his right side
was toward the defendant, and then by pointing out their
respective positions on the map showed that his left side must
have been toward the defendant, the jury would doubtless,
under such circumstances, have conceived the discrepancy to
have been the result of a mistake and not a desire on the
part of the witness to lie about the matter.   But, as shown,
the fact is, that the witness said that he was not certain
whether his left or his right side was toward the defendant.
The ruling was absolutely harmless.

4. The court did not err by allowing to be received in evi-
dence the over and under shirts worn by the deceased at the
time he was shot.   These articles were introduced in connec-
tion with the testimony of Cervera Norgard.   Counsel for the ·
defendant complain that, since there was no dispute as to
the character of the wound inflicted upon the deceased by the

defendant and from which death ensued, and there being, therefore, no necessity for placing those articles, "gory and gruesome" from matted blood, before the jury, the result of the ruling allowing them to be exhibited at the trial was only to greatly prejudice the jury against the defendant. But, whatever might have been the tendency of the gruesome exhibits, apart from the legitimate purpose for which they were offered and received, it is clear that the people, in making their original case, were entitled to thus corroborate the testimony of the witness, Cervera, with regard to the manner in which his brother came to his death. (*People* v. *Hower,* 151 Cal. 645, [91 Pac. 507].) The people, in the maintenance of the burden cast upon them of proving the guilt of one charged with crime, are not supposed to anticipate the contentions or concessions, if any, which the defendant intends to make, or, in other words, to assume that certain matters or theories supporting the hypothesis of guilt will not be disputed by the defendant. By the garments received in evidence the point of entrance of the bullet into the body of the deceased could be approximately shown, and thus would Cervera not only be corroborated as to the shooting, but (the shot having taken effect in a vital part of the body) the intention of the defendant to inflict a mortal wound to some extent disclosed. At any rate, as declared, the people had the right to establish their original case by the introduction into the record of any relevant fact, circumstance or physical object having a tendency to prove the death of the deceased by violent means and that the act causing death was criminal.

5. The witness Travis, who was a member of the jury summoned by the coroner to inquire into the cause of the death of the deceased, was asked by the district attorney whether the defendant testified at the inquest, and whether there was anything said about taking his testimony. No objection was interposed to these questions and the witness answered them in the negative. He was then asked whether Haydon appeared at the scene of the homicide, where the inquest was held, while the investigation was in progress. To this question an objection on general grounds was made and overruled. The answer was that the defendant was not present at the inquest. It is here argued that the ruling was erroneous and prejudicial. It was, in our opinion, imma-

terial whether Haydon did or did not testify at the coroner's inquest, so far as the fact itself was concerned, but, the witness having been permitted, without objection, to say that he did not testify at that investigation, it would seem to be the more reasonable view that, if having any effect upon the jury at all, the answer to the question complained of was favorable rather than unfavorable to the accused. To be more explicit, the statement that he did not testify at the inquest, if not satisfactorily explained, as manifestly it was by the answer to the question objected to, might have been construed by the jury in a light unfavorable to the defendant—as, for illustration, the jury might, and probably would, have concluded, had they not been made acquainted with the fact that the defendant was not present at the inquest, that his failure to voluntarily explain or offer to explain to the coroner's jury how the homicide happened was due to a consciousness of guilt.

6. The same witness having, shortly after the homicide, appeared at the scene of the shooting and with others examined the ground thereabouts in search of empty cartridge shells, was asked on cross-examination at what distance from the point where the body of the deceased lay he ceased looking for shells. To this question an objection by the people was sustained on the ground that the same question had been asked by counsel for the defendant and answered by the witness several times previously. The ruling was proper. The witness had before been asked some three or four times how far from the body he had gone looking for shells. Once he answered that he went no farther than eight or ten feet from the body. At another time he said that he went ''ten, twelve or fifteen feet.'' It is evident from these answers that the witness could not have given the distance any more accurately than was thereby given, and the question to which objection was sustained could, therefore, have accomplished no more in that regard than was disclosed by said answers.

7. The witness, Ornbaum, testifying on behalf of the defendant, declared that the general reputation of the deceased for peace and quiet in Round Valley, Mendocino county, where the Norgard family reside, was bad. On cross-examination the district attorney sought to show by the witness that for many years the residents of Round Valley were

18 Cal. App.—36

divided into factions growing out of differences of views on matters of local concern, and between which factions intensely bitter feelings of hostility had been developed and were sustained for a long period of time, the result of which was that members of the respective factions constantly carried on a sort of warfare of criminations and recriminations. It was not directly shown that the Norgard family was identified with either of these factions, but the object of this cross-examination was presumably to show that the Norgard family, including the deceased, did belong to one of said factions, and that the adverse criticisms or derogatory statements from which the witness formed his conclusion as to the general reputation of the deceased in Round Valley were merely those that were directed generally against the faction of which the Norgard family were members rather than from anything generally said derogatory of the character of the deceased for peace and quiet. The specific objection to this line of cross-inquiry was that it had not been shown that the testimony thus sought to be brought out had any application to the deceased or his family. The objection was disallowed. We suppose the real ground of the objection counsel intended to make was that the Norgard family, more particularly the deceased, had not been shown to have belonged to one of the factions referred to. We think the cross-examination was pertinent and proper. It will not be denied that the district attorney was authorized to secure from the witness the facts constituting the basis of his statement regarding the general reputation of the deceased so as to show, if thus he could, that the witness' testimony upon that question was founded upon remarks or statements of neighbors of the deceased having no particular reference to the latter or no more reference to him than they had to others belonging to the same faction to which he belonged. The answer of the witness was that the people of Round Valley had been divided on a "wet and dry fight" (the liquor question, we apprehend) and that there had been "a good deal of gossip around there lately" growing out of that question. It is to be conceded that the district attorney did not *directly* show that the deceased or his family were in any manner connected with either of the factions arraying themselves against each other on the "wet and dry fight," and consequently made a very slight showing

toward the establishment of the point he thus attempted to develop; yet his failure to show what he thereby sought to prove argues nothing against the propriety of such cross-examination or any cross-examination having a legitimate tendency to disclose that there existed no real foundation for the direct testimony of the witness that the general reputation of the deceased in Round Valley for the traits referred to was bad. The objection, it seems to us, is rather to the evidentiary value or weight of the testimony thus sought to be elicited than to its competency. At any rate, the answer could have resulted in no harm to the defendant. If, as the defendant insists is true, the testimony thus brought out did not tend to show that the witness had grounded his testimony as to the general reputation of the deceased upon the aspersions cast generally upon a faction to which the deceased belonged by the members of an opposing faction, it had no tendency to show anything, either favorable to the prosecution or unfavorable to the defendant. Indeed, if having any force at all, one way or the other, the effect of the failure of the district attorney to break down the force of the witness' direct testimony relative to the reputation of the deceased would be favorable rather than unfavorable to the defendant.

8. What we have said with respect to the rulings on the cross-examination of the witness Ornbaum disposes of the exceptions to the rulings of the court permitting a similar cross-examination of the witness Lacy Gray, who testified on his examination in chief that the reputation of the deceased for peace and quiet in Round Valley was bad.

9. It is contended that the court erred to the prejudice of the defendant by allowing the district attorney to go into the question, on cross-examination of the witness Palmer (step-father of John Wathen), whether the witness had been, during practically all the time in which the trial had been in progress, greatly under the influence of intoxicating liquors. The witness, in behalf of the defendant, had testified that a few weeks prior to the day on which the homicide occurred and about six months previously to the trial of this case he had a conversation with Chris. Norgard, in Covelo; that he (the witness) called on Norgard for the purpose of selling or offering to sell him the Wathen place; that Norgard said that he would not buy the place, and that if any other person

bought it he would continue to run Long Ridge, as he had "come as near" doing "as any man that has been on Long Ridge"; that he would "send the boys, my fighting men down," etc. The purpose of the questions propounded to Palmer by the district attorney was to show that, from an inordinate use of alcoholic stimulants, the memory of the witness had become unreliable, and thus it was designed to disclose either that he might not have accurately recollected what Norgard actually said to him on the occasion mentioned or that, Norgard not having then made the implied threats to which the witness testified, the latter had committed to memory, for the purpose of the trial, a fabricated story of the former's part in the conversation. There are two answers to the exceptions registered here to this line of cross-examination. In the first place, it is only the statement of an elementary proposition when it is said that a party may with perfect propriety propound any proper questions to an adverse witness for the purpose of testing his memory as to the facts or circumstances to which he testifies. Indeed, whether a witness is of good or bad memory constitutes one of the common tests by which the jury are enabled to determine the amount of weight which they should give his testimony. Therefore, any legitimate line of inquiry, prosecuted in good faith, or for which there exists a reason, bearing upon the question of the witness' memory or want of memory, is eminently proper. The examination of Palmer on this line by the district attorney developed that there existed legitimate ground for the inquiry. To the first question asked him as to his conduct with regard to his condition for sobriety (or inebriety), he replied that he had been drunk "pretty near all of the time, I guess." This answer, it is true, was stricken out on motion of the defendant to give him an opportunity "to put in an objection" to that course of cross-examination of the witness. But the answer, nevertheless, disclosed that the question was asked not merely to prejudice the witness, but because there was a substantial reason for asking it. Later, however, the district attorney put to the witness this question: "You say you have been drunk about ever since you have been here?" to which the witness replied: "All the time I wanted to." There was no objection to this question, nor was there a motion made to strike out the answer, and this suggests the

second reason why the exception urged here on this line of inquiry can avail the defendant nothing. The assignment of error to which counsel excepts in his brief refers to the first question and answer relative to the condition of the witness, but, as the court struck that answer from the record, as we have shown, on the motion of the defendant, and as there appeared a reason for that line of cross-examination—that is, that there was justification for that line of inquiry and that it was not conducted for the purpose merely of degrading the witness in the estimation of the jury—there is, therefore, nothing of which the objection can be predicated or on which it can properly be pressed on this appeal.

10. The witness, Reid, having testified that the general reputation of the deceased for peace and quiet in the Mad river section of Trinity county was good in the years 1903, 1904 and 1905, was asked the following question on cross-examination by counsel for the defendant: "Did you hear of his being accused of robbing the Mason & Thayer safe at Douglas City?" To this question an objection by the district attorney was sustained. It is now argued with apparent earnestness that the ruling was erroneous and prejudicial. But we cannot take that view of said ruling. In the first place, the witness was asked nothing concerning the general reputation of the deceased for those traits of character essentially involved in the crime of robbery, of larceny or of burglary. In the second place, in view of the nature of the charge upon which the defendant was on trial, it would have been manifestly improper to have prosecuted an inquiry on the direct examination of the witness for the purpose of developing the general reputation of the deceased for honesty and integrity. The question was, therefore, neither proper cross-examination, nor in any sense relevant. It does not follow, as the question necessarily assumes, that, because a person may be wanting in honesty and integrity, he cannot at the same time be of a quiet and peaceable disposition in the sense in which the last-mentioned traits become important on an issue as to which of two combatants in a physical encounter was the aggressor or culpable party. Testimony relative to the reputation for peace and quiet borne by the actors in an affray leading to the prosecution of one or both for a criminal offense necessarily involving those traits is generally intro-

duced only where the case is a close one upon the question whether the accused was or was not justified in committing the act, and the issue thus submitted is not, obviously, whether the party is honest and of integrity, but whether he is or is not of a quarrelsome and pugnacious character and readily open at all times and at any moment to a physical combat without just or any reason. The utter untenableness of the contention of appellant may be illustrated by the absurd result to which it would logically lead, for, if testimony of the good reputation of a person for peace and quiet may properly be rebutted by testimony of his bad reputation for honesty and integrity, then, by parity of reasoning, his bad reputation for peace and quiet may properly be overcome by evidence that he bears the general reputation of being a person of honesty and integrity. But the true rule as to character evidence is that such testimony ought always to be confined to the trait of character which is in issue, or ought to bear some analogy and reference to the nature of the charge. (3 Greenleaf on Evidence, 12th ed., sec. 25; Phillips on Evidence, p. 490; *State* v. *Beal,* 68 Ind. 345, [34 Am. Rep. 263]; *State* v. *Marks,* 16 Utah, 204, [51 Pac. 1090].) The question asked the witness here and disallowed by the court called for testimony, as we have shown, bearing no analogy to the charge or any of the elements thereof against the accused, and, since the party whose character was under attack was not a witness and, therefore, his credibility as such not put in issue, the testimony thus sought to be brought out was not relevant for any purpose. (*State* v. *Marks,* 16 Utah, 204, [51 Pac. 1090].)

11. We now come to the last point involving rulings on the evidence upon which we feel impelled to bestow special attention. The proposition thus presented is the most important of the many submitted on this appeal, and its solution will require a careful review of the circumstances giving rise to it.

It will be recollected that John D. Wathen intermarried with the daughter of Chris. Norgard, and that on account of said marriage a feeling of hostility was generated between the Norgards and Wathen. The latter, while used for certain purposes as a witness for the people, was also called to testify in behalf of the defendant. Testifying for the latter, he said

that he saw the deceased and his brother, Elmer, a few days before the homicide; that they passed his house at a distance of about twenty-five feet therefrom, and that neither addressed him; that each carried a rifle incased in a scabbard, which was strapped or attached to the stirrups of his saddle; that, on the afternoon of the day of the homicide and a short time prior to the shooting, he and his half-brother, Palmer, rode over to Bald Mountain, and that at that time they saw the defendant's horses (those driven to the flat by the deceased and his brother, Cervera) grazing on the Rorobough land, which, as shown, was under lease by Haydon; that, when he last saw the horses (about an hour and a quarter before the shooting) they were going farther in on the Rorobough land. He further testified that, in going in a direct line from the Norgard pasture, to which the deceased and his brother went after driving defendant's horses to the point already referred to on "the flat," to the Norgard camp it was not necessary to go nearer than about seventy-five feet to the spot where the deceased's dead body lay or where the shooting occurred. In other words, he said that the natural direction from the pasture to the Norgard cabin was seventy-five feet distant and north of the precise spot where the shooting took place, and that there was no natural trail passing right by the body. Manifestly, the purpose of all the foregoing testimony was to show that the deceased himself was seeking trouble with the defendant and that he drove Haydon's horses off the Rorobough range, on which they were entitled to graze, and unnecessarily put himself in the way of the defendant for no other reason than to precipitate a physical conflict of some character with the latter.

Wathen admitted, on his direct examination, that, although on friendly terms with the Norgard family prior to his intermarriage with Norgard's daughter, after that event his relations with his wife's family had always been unfriendly; but, on cross-examination, the district attorney asked him whether his feeling toward the Norgards was not very bitter, to which question he replied in the negative, saying, however, that he merely had "no use" for the Norgards. To show the intensity of his hostility toward the Norgards, the district attorney questioned the witness as follows: "Q. Did you send for Tom Haydon to come in there and take your property off

your hands? A. No, sir. I didn't. . . . Q. Didn't you induce Mr. Haydon to come in there, and induced him to take the land off your hands because you believed he would kill the Norgard boys? A. No, sir, I did not. Q. You wanted some man to take hold of that land that you believed would kill them, didn't you? A. No. Q. That thought never entered your mind? A. No." The witness was then asked if he recalled having a conversation with one Dan English, near the postoffice, in Covelo, in the latter part of November, 1910, and prior to the homicide, and in the course of which he declared that he "had sold out to the right man, all right," that "Haydon would not stand for what you [the witness] had stood for, and the first time that Haydon caught these Norgard boys running these horses he would shoot them off their horses?" The witness admitted having a conversation with English at the time and place mentioned, but said that he had no recollection of making the statement concerning Haydon and the Norgard boys embraced within the question, although he admitted that he might have made it.

No objection was made by the defense to any of the foregoing questions so propounded to Wathen.

In rebuttal, the people called said English to the stand and, over the objection of the defense, were permitted to ask him the following question, to which he made an affirmative answer: "I will ask you whether or not he [referring to Wathen] stated to you on that occasion [the time and place having been given] 'that he thought he had sold out to the right man, all right, and that the first time that Haydon caught the boys running his horses he would shoot them off their horses.' "

The specific objection to this question was that it called for testimony relating to a collateral matter, brought out by the people themselves, and by which they were bound. The asserted theory upon which the question was propounded and an answer thereto allowed was that it was in impeachment of Wathen on a matter which was material, because it affected or involved the question of his credibility as a witness.

While we think that the district attorney could perhaps have well rested this phase of his case on the statement of Wathen that, at the time of the trial and for some time before the homicide, he was on unfriendly terms with the Norgards,

we are of the opinion, after a careful analysis of Wathen's testimony in the particular under consideration, that the testimony of English was proper as in impeachment of Wathen on the point to which it related. It is true, ordinarily, that the admission of a witness that he was not friendly with the party against whom he had testified in chief would be a sufficient predicate for an argument or, possibly, an inference that his testimony was or might be biased or that he might have exaggerated the nature and importance of the circumstance or circumstances to which he had testified. But it will be observed that Wathen said that he was not *"bitterly* unfriendly against" the Norgards, but that merely he had "no use for them"; that he did not "know anything against them," which statements would imply that his unfriendly feeling toward the Norgards was of an indifferent character— that is to say (to present the idea more clearly), that, while his relations with that family were not amicable, still he harbored no feeling of resentment or revenge against them and entertained no such sentiments toward them as would induce him to treat them unfairly or unjustly in this case, or, for that matter, under any circumstances. This is undoubtedly the view that the district attorney and the court took of his testimony addressed to the point under consideration. Now, then, we do not think that the proposition can be doubted that, where a witness, who admittedly entertains a feeling of unfriendliness toward the opposing party, undertakes to convey the impression to the jury, or the judge, if the facts are so tried, that such feeling does not reach that degree of animosity or that point of violent hatred that, in view of human frailties, may safely be said will ordinarily lead a witness to color or exaggerate statements calculated to injure his adversary, the extent or degree of enmity that really exists in the breast of such witness against his opponent, or the person against whom he has testified, may properly be shown. In other words, the district attorney was not compelled to accept as conclusive what appears to be the natural and reasonable import of Wathen's testimony that, while he was unfriendly with the Norgards, his feelings in that respect were merely of an apathetic character, but was entitled to show that the witness entertained a very bitter feeling against the Norgards and thus furnish all possible aid to the jury

in determining how much, if any, weight Wathen's important testimony against the theory of the defendant's guilt as contended for by the prosecution was deserving of. It may be true, as counsel for the defendant assert, that English's testimony had a much more far-reaching effect upon the jury than that of the only purpose for which it was admissible, viz., to impeach the testimony or the credibility of Wathen, yet this is not, and never has been, a ground on which impeaching evidence may be excluded. It is doubtless true that in very many instances impeaching testimony has brought before a jury matters which could not be made the subject of independent or substantive proof, but, in such cases, if the party against whom such testimony is received, would avoid, as far as possible, any damaging effect it might have and which it was not designed to produce, he should request an instruction expressly limiting its consideration by the jury to the purpose for which it was admitted and is admissible. (*People* v. *McCrae*, 32 Cal. 98; *People* v. *Collins*, 48 Cal. 277; *People* v. *Estrado*, 49 Cal. 171; *People* v. *Ah Yute*, 53 Cal. 613.)

But Wathen admitted, in answer to questions to which no objection was interposed, that he *might* have made the remarks which English declared that he made in the conversation mentioned, and from that admission the jury could have reasonably inferred that he at least entertained the opinion which English said he expressed as to what Haydon would do with the Norgard boys if the circumstances indicated arose. No person will, ordinarily, admit that he might have expressed an idea or an opinion to which he has no recollection of giving utterance if that idea or opinion had never entered his mind, and the average mind would so construe such an admission. Under this view, the testimony of English, even if it might correctly be held to have been improperly allowed, could not have had the effect of damaging the defendant much, if any, more than Wathen's admission that he might have made the remarks attributed to him by English.

We have now given special attention in this opinion to all the assignments of error growing out of the rulings on the admission and rejection of evidence, with the exception of those numbered 2, 6, 7, 8, 9, 10, 14 and 15 in the order in which these assignments are discussed in the defendant's opening brief. As to the last-mentioned assignments, it may

be remarked that we have given each of them careful consideration and have found nothing therein prejudicial to the accused or that seems to entitle them to special notice.

We have with equal care and much patience examined the whole record, consisting of eight large volumes of the stenographer's transcription of the testimony and the voluminous briefs, exhaustively and ably treating the numerous points pressed upon us for a reversal of the judgment and the order of the trial court, but we have thus discerned no just reason for declaring that the defendant was not fairly and legally tried and justly convicted. The judgment and order are, therefore, affirmed.

Chipman, P. J., concurred.

Burnett, J., concurred in the judgment.

A petition to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on May 24, 1912, and the following opinion then rendered thereon:

THE COURT.—The petition of defendant for a rehearing of this cause in the supreme court is denied.

The opinion of the district court of appeal contains the following passage concerning section 4½, article VI, recently added to the constitution:

"But if there is one proposition in connection therewith of which we entertain no feeling of uncertainty, it is that said amendment was not intended to change, nor has it changed, the very sensible rule prescribed by the constitution and for so many years strictly adhered to in this state, that, in the exercise of their appellate jurisdiction, the appellate courts are restricted to the consideration of questions of law alone, and that, therefore, as before stated, the matter of evidence does not constitute a subject of review by those tribunals, except where there necessarily arises from the evidence or is presented thereby, from its very nature, a question of law."

This court regards this statement as wholly unnecessary to the decision of the case. The denial of the petition for a rehearing is not to be understood as an indication of approval or disapproval of said statement by the supreme court.